ROBERT KEENAN, RUSSELL P. BREWER and
HARVEY W. MARVIN,

Defendants Below, Appellants,

*vs.*

MILTON C. ESHLEMAN, S. A. SEALS, and
GEORGE E. JAMES, JR.,

Complainants Below, Appellees.

*Supreme Court, On Appeal, November 28, 1938.*

LAYTON, C. J., and HARRINGTON, RICHARDS, RODNEY, and SPEAKMAN, JJ., sitting.

*Hugh M. Morris* and *Ivan Culbertson,* for appellants.

*William Prickett,* for appellees.

LAYTON, C. J., delivering the opinion of the Court:

This is an appeal from a decree of the Court of Chancery ordering the appellants to make restitution of certain money wrongfully obtained from Sanitary Company of America, a Delaware corporation, of which they were directors and officers.

The material facts of the case as they appear from the bill of complaint, the answer filed, the answers to interrogatories, stipulations of fact and oral testimony, are as follows:

In 1919, H. A. Stone & Co., hereafter referred to as Stone, was organized under the *General Corporation Law, Rev. Code* 1915, § 1915, *et seq.* Its business was to finance existing small companies in need of financial assistance. Its plan was to sell for any company accepted by it as a client an issue of its preferred stock, receiving in payment for its services a block of the common stock always in an amount exceeding fifty per cent. This company caused to be organized, and it wholly owned, General Stabilizing and

Guaranty Fund, Inc., hereafter referred to as General, which, although without assets, would undertake to guarantee the payment of dividends on the preferred stocks of the client companies of Stone, it being conceived that this arrangement would tend to facilitate the sale of the preferred stocks to the public. Sanitary Company of America, hereafter referred to as Sanitary, was one of the client companies of Stone. It was engaged in the manufacture of sewer pipe and plumbing supplies with factories in Pennsylvania.

In 1923, Stone and General failed, and their assets were taken over by a stockholders committee consisting of the appellants and Sprague and Hall. The assets, *inter alia*, consisted of 4,500 shares of the common stock of Sanitary, blocks of stock of other client companies of Stone, and waterfront land in Mobile, Alabama.

Consolidated Management Association, hereafter referred to as Consolidated, was organized under the *General Corporation Law* in 1924 for the purpose of receiving and administering the assets of the Stone enterprises in the hope that they would increase in value and result in some return on the investments of the stockholders. All of the remaining assets of Stone and General were transferred to Consolidated including the 4,500 shares of the common stock of Sanitary, which company had issued and outstanding 7,200 shares of common stock. All of the stock of Consolidated was issued to Keenan and Brewer as voting trustees under a voting trust agreement; and they, in turn, issued "beneficial certificates" to the stockholders of Stone in amounts proportionate to their holdings in Stone. By this arrangement, Keenan and Brewer, as voting trustees of the stock of Consolidated, controlled that company, and Consolidated controlled Sanitary by reason of its ownership of a majority of the voting stock of Sanitary.

The appellants constituted the board of directors of.

Consolidated from its organization in 1924 until 1933 when it went into receivership, and during all this period, Keenan was its president, Marvin its vice-president, and Brewer its secretary and treasurer, except for the first year when Brewer was secretary and one Scott was treasurer. During all this period the appellants were three of the five directors of Sanitary, Keenan being its president and Brewer its secretary and treasurer. The other two directors were nominees of Keenan and Brewer.

During Stone's existence each of its client companies paid to it approximately $300.00 per month for so-called management fees. Sanitary had paid the monthly fee, but no contract therefor was shown although the answer so averred, and the complainants frequently called for its production.

Upon the formation of Consolidated, Sanitary and one or two other client companies which were still in existence, continued to pay the monthly fee, although there was no contract between the companies and Consolidated for the payment of this fee. The general idea seems to have been borrowed from Stone, and with respect to Sanitary in its relation with Consolidated, the origin of the fee seems to be this: upon the organization of Consolidated it engaged the services of one Scott as auditor at a salary of $500.00 per month. Sanitary, as well as one or two other companies controlled by Consolidated, paid to the latter company $300.00 monthly for alleged auditing services. In October, 1924, a few months after the organization of Consolidated, Scott was dismissed by Sanitary, being able to carry on without outside help, but the monthly sum was continued to be paid to Consolidated by Sanitary under a resolution of Sanitary's board of directors, of November 15, 1924, reading as follows:

"For services rendered and to be rendered by Consolidated Management Association from time to time for and on behalf of the stockholders of this company and for which the sum of $300 per

month is provided to be paid, payment thereof is hereby authorized and approved."

This resolution contained the only reference in the minutes of Sanitary to the monthly fee, and how it was entered in the books did not appear as the books were not put in evidence by the appellants. At the time the resolution was adopted and until 1933, when Consolidated went into receivership, the entire personnel of Consolidated consisted of the appellants, as its directors and officers, and one part time stenographer.

Brewer testified that Scott had been engaged by Sanitary "for the purpose of paying three hundred dollars a month into Consolidated Management Association, not for services rendered by him to Sanitary Company of America."

From 1924 to 1932 inclusive Sanitary paid to Consolidated for so-called management services $28,800.00. Upon taking over the management of Sanitary by Consolidated in 1924, one Derbyshire, then a director of Sanitary, was made superintendent under a three year contract at $12,000.00 annually, and at the expiration of this contract, Keenan assumed the management.

During the period from 1924 to 1932 Sanitary paid Keenan and Brewer salaries. For the years 1924 to 1925, Keenan received $2,400.00 annually; for 1927, $4,500.00; for the years 1928 and 1929, $7,200.00; for 1930, $8,400; for the years 1931 and 1932, $10,800.00 annually, and for 1933, $4,800.00. Brewer, as secretary, received an annual salary of $1,200.00. In addition to these salaries the board of directors of Sanitary in 1930 appropriated $5,000.00 to be distributed among its officers and higher employees as a bonus. Keenan and Brewer each received a share, but neither could recall the amount. In 1931, a sum of $10,-000.00 was likewise appropriated to be allocated by Keenan among the officers and foremen. Keenan admitted having allocated to himself $3,000.00 or $4,000.00, and to Brewer, $600.00.

During the same period Consolidated paid salaries to its officers, Keenan, Brewer and Marvin. For 1924, Keenan received $1,400.00; for 1925, $2,800.00; for 1925 to 1931 inclusive, $2,400 annually; and for 1932, $1,200.00. Brewer, for the year 1924, received $1,050.00; for 1925, $1,600.00; for the years 1926 to 1931 inclusive, $1,200.00 annually; and for 1932, $600.00. Marvin, for the year 1924 received $400.00; for 1925, $650.00; for the next succeeding six years, $600.00 annually, and for 1932, $300.00. The aggregate of these sums paid out as salaries was substantially identical with the aggregate of the amounts received from Sanitary by Consolidated for supposed services, and received by Consolidated from another corporation under a similar arrangement.

In regard to what the officers of Consolidated did for Sanitary, Brewer testified as follows:

"The usual management work any officer would do. We studied the situation; worked out economies; I sought advice from my employer * * * on problems. I had the advantage of that consultation, which I gave to Sanitary Company of America; and I gave it the advantage of my own technical knowledge in revamping electrical equipment, and did whatever seemed necessary to do, which would be advantageous to the company."

The complainants assert that the appellants were guilty of conduct amounting in law to fraud, in that they used their control of the two corporations to exact from Sanitary a double compensation for the same service.

The appellants assert that they were guilty of no fraud, active or constructive. They contend that Consolidated was formed for a purpose, both desirable and necessary for the welfare of Sanitary and other underlying companies; that it was set up under the supervision of able and respectable counsel; and that it could not function unless Sanitary and the other companies paid into its treasury management fees. The theory of the defense is that Consolidated was formed to preserve and conserve the Stone

assets; that the management of Sanitary of whose common stock it owned a majority interest was a fundamental part of its duty; that Consolidated did render to Sanitary efficient management services for which Sanitary properly paid; and that the appellants, as officers of Consolidated, received salaries as any corporate officers would. This defense is easily understood, and in a proper factual setting would be effectual. But, the only personnel of Consoliated were the appellants and one part time stenographer. The only agents through which Consolidated could render service of any kind were the appellants. Keenan and Brewer were paid, and it seems adequately, by Sanitary for conducting its affairs. It does not appear that, as officers of Consolidated, they rendered to Sanitary any service whatever which, as officers of Sanitary, were not within the purview of their duties as such officers. They contended that Consolidated maintained offices, first in Philadelphia, later in Wilmington, at which Sanitary's stockholders could obtain information with respect to its affairs; but, as Sanitary maintained its own offices in Pennsylvania, and as the source of the information, in any case, would be the same, it is impossible to view the fact of the maintenance of an office as a service to Sanitary justifying the payment of management fees to Consolidated. The fact that Consolidated could not function unless the companies paid to it management fees, if true, is of small importance. Sanitary, as a corporation, received no benefit from Consolidated, and was not interested in its existence. In fact, it would have been better off to the extent of $28,800.00 if it had never existed. Conceding that the initial purpose for the formation of Consolidated was a proper and innocent purpose, it is clear that the appellants, having control of both companies, made use of the opportunity thereby created to enrich themselves improperly at the expense of Sanitary.

But, the appellants, themselves, depart from this

theory. They also defend on the ground that, as officers and directors of Sanitary, they rendered services to the corporation, unusual and extraordinary in their nature, and outside of the scope of their duties as officers and directors, and in circumstances giving rise to an implied obligation to be paid therefor. This contention merely is that the money they received through the medium of Consolidated was, in reality, paid them by Sanitary for services beyond their duties as officers and directors of Sanitary.

It is claimed that by reason of their work and effort certain waterfront property in Mobile, Alabama, was disposed of for $92,000.00. This real estate, however, was an asset of Consolidated. Sanitary, as a corporate entity, had no interest in it whatever. The appellants' contention that their efforts in realizing an asset of Consolidated are to be regarded as a service rendered to Sanitary, for which they were entitled to compensation is essentially unsound.

Again they contend that, by their efforts and business acumen, they realized $18,000.00 from a mortgage of the Hecla Mining Company held by Sanitary. This mortgage was a third mortgage. It was taken to secure what was a misappropriation of its money by Stone in lending to the mining company Sanitary's money. The mortgage was actually sold for $100.00, but, as for that income tax year Sanitary had made considerable money, the appellants returned the mortgage as a loss of $139,900.00 and thereby saved Sanitary $18,000.00 in income taxes. Manifestly, the appellants did nothing beyond what was required of them as officers and directors to do.

Again they contend that Keenan and Brewer endorsed notes for the company, and that Keenan loaned the company money on mortgage. The notes were paid. The mortgage with interest at six per cent. was paid. They lost nothing. There was no agreement by the company to pay anything for the endorsments, or as a bonus for making

the mortgage loan. Moreover, these acts were done in 1927 and 1928 when Keenan took over the active management of the corporation. The management fees of $300.00 per month were voted in 1924, when it was not contemplated that Keenan and Brewer would endorse notes for or loan money to the company. A quite similar claim for compensation was denied in *Cahall v. Lofland, et al.,* 12 *Del. Ch.* 299, 114 *A.* 224.

Finally much is made of the company's success under the appellants' management. It would seem that the theory of this argument is that if the company prospers, compensation which would be illegal if taken when the company was in failing circumstances, is cleansed of the taint of illegality. There is no merit in this contention. The taking of money by the appellants was for at least three years when the company, admittedly, was in a difficult financial position. Following a period of prosperity, the payments continued although Keenan's salary was greatly increased, and bonuses were paid to both Keenan and Brewer. In a period of depression the payments never ceased.

The appellants were in absolute control of both corporations. As directors, they were trustees for the stockholders, and the utmost good faith and fair dealing was exacted of them, especially where their individual interests were concerned. *Lofland, et al., v. Cahall,* 13 *Del. Ch.* 384, 118 *A.* 1. The resolution of November 15, 1924, whereby Sanitary agreed to pay to Consolidated monthly management fees, adopted by a board of directors of which the appellants were a majority, was at the least a voidable transaction. In the first place, the votes of the appellants could not be counted in making up a majority of the board. *Fletcher, Cyc. Law Private Corporations, Sec.* 936; *Cahall v. Lofland, et al.,* 12 *Del. Ch.* 299, 114 *A.* 224. In the second place, dealing as they did with another corporation of which they were sole directors and officers, they assumed the burden of showing the entire fairness of the transac-

tion. *Geddes v. Anaconda Copper Mining Co.*, 254 *U. S.* 590, 41 *S. Ct.* 209, 65 *L. Ed.* 425. This burden they signally failed to maintain. The conception of corporate entity is not a thing so opaque that it cannot be seen through; and, viewing the transaction as one between corporations, casual scrutiny reveals that the appellants, in fact, dealt with themselves to their own advantage and enrichment. The employment of Consolidated by Sanitary was merely the employment by the appellants of themselves to do what it was their plain duty to do as officers of Sanitary.

The theory that the appellants performed unusual and extraordinary services for Sanitary and beyond the usual duties of officers and directors is insupportable both in fact and in law. Insupportable in fact, because they did nothing of benefit to Sanitary beyond what was their clear duty to do. Insupportable in law, because there was no express contract providing for what amounted to an additional compensation, and because there was no understanding by officers competent to represent Sanitary that the so-called services were to be paid for. *Lofland, et al., v. Cahall, supra.*

The court below (*Eshleman v. Keenan, et al.,* 21 *Del. Ch.* 259, 187 *A.* 25) condemned as fraudulent the acts and conduct of the appellants. No other view was possible under the law and the facts. Marvin, it is true, was not an officer of Sanitary and was paid no salary by that company. He, however, received a salary from Consolidated from money obtained in part from Sanitary. He participated in the wrong, and was properly held to be jointly and severally liable with Keenan and Brewer.

At the conclusion of the hearing before the Chancellor, the appellants sought leave to file a supplemental answer setting up ratification, approval and confirmation of the appellants' acts by a majority of the stockholders of Sanitary. Leave was refused on the ground that the acts and conduct of the appellants constituted fraud on the corpora-

tion, and that it was not in the power of the majority of the stockholders to deprive the minority of their right to insist upon a rectification.

The appellants take the position that a majority of the stockholders of a corporation may ratify any act or transaction which, in the first instance, they might have authorized. However, acts which are *ultra vires*, illegal or fraudulent are expressly excepted from the class of acts subject to ratification. The cases cited by the appellants do not support their contention. In *Karasik v. Pacific Eastern Corporation*, 21 *Del. Ch.* 81, 180 *A.* 604, 609, no fraud was found in the directors' consideration and acceptance of the offer of settlement of a disputed claim. *Continental Securities Company v. Belmont*, 206 *N. Y.* 7, 17, 99 *N. E.* 138, 51 *L. R. A.* (*N. S.*) 112, *Ann. Cas.* 1914A, 777, is an authority for the principle that a majority of the stockholders cannot sanction a fraudulent misappropriation or misapplication of the corporation's funds. In *United States Steel Corporation v. Hodge*, 64 *N. J. Eq.* 807, 54 *A.* 1, 60 *L. R. A.* 742, the court affirmatively found that there was "an entire absence of anything to show a taint of fraud." *Grant v. United Kingdom Switchback Railways Co.*, 40 *Ch. Div.* 135, is a case of the same kind. In *Nye v. Storer*, 168 *Mass.* 53, 46 *N. E.* 402, it was distinctly held that the lease referred to was not fraudulent. In *Gamble v. Queens Water Co.*, 123 *N. Y.* 91, 25 *N. E.* 201, 9 *L. R. A.* 527, it was specifically found that the defendant directors were not actuated by any fraudulent intent in making the contract complained of. *Continental Insurance Co. v. New York & H. R. R. Co.*, 187 *N. Y.* 225, 79 *N. E.* 1026, was a case similar to the *Karasik Case, supra.* In *Wellington Bull & Co. v. Morris*, 132 *Misc.* 509, 230 *N. Y. S.* 122, there was no charge of actual fraud, or that the defendant controlled his fellow directors, or that they acted in bad faith.

The appellants, in the instant case, were clearly guilty of a fraudulent misapplication of the funds of the corpora-

tion.   Such acts are not subject to ratification by stock-holders.

Finally the appellants contend that the recovery de-creed by the court below should have been limited to those stockholders who had not acquiesced in, ratified, approved and confirmed the wrongful acts complained of. The ques-tion was first suggested by the Chancellor in his opinion reported in 21 *Del. Ch.* 259, 187 *A.* 25: whether ratification by a majority of the stockholders, while not sufficient to bar a remedy to the minority, may yet be shown for the pur-pose of confining the relief of the decree to the dissentients only.   In his opinion reported 22 *Del. Ch.* 82, 85, 194 *A.* 40, 42, the question was posed as follows: "Should the defend-ants pay to the corporation the full amount of restitution, or should they only pay to the complainants individually the *pro rata* amount of the recoverable sum which the proportion of their shares bears to the total number of shares outstanding?" He observed that the bill was filed on behalf of the corporation; that the relief sought was in redress of a wrong to the corporation; and that if the re-coverable amount should be reduced to a sum sufficient to recompense only the dissentient stockholders and should be decreed to be paid to those of them asserting their claim, the suit would be transformed by the decree to one seeking an individual redress from one asserting a corporate claim; that the only theory upon which this case could be justified was that as the corporation's claim against the officers was a part of its assets, and that as the assets were derivatively the property of the stockholders, it must follow that if the complainants and others in like situations should be paid this aliquot part of the recovery, they would be fully com-pensated; that this view treats the recovery as an asset available for dividends immediately to be distributed; and that as some of the stockholders had by their votes waived their rights to their share of the dividends, payment should be decreed only to the dissenting stockholders.   After re-

viewing the cases, the court below disapproved entirely of the theory of such decree in the circumstances presented, and ordered restitution in full to be made to the corporation. The appellants assign this as error, and urge that, within the principles of remedial equity, adequate redress of the wrong would be accomplished by a decree awarding to the dissentients an aliquot part of the recovery; and they offer certain authorities in support of their contention. In *Bailey v. Jacobs*, 325 *Pa.* 187, 189 *A.* 320, it appears that the bill of complaint was filed by the complainants to compel the defendant, as president of a corporation, to account to the complainants as shareholders, for profits made through his personal use of corporate assets. The court observed that while the bill asserted a cause of action which was essentially derivative from the company itself, yet that distribution of the amount recoverable could be properly made directly to the plaintiffs, and that it was not necessary that the money be paid into the treasury of the company and then redistributed, since shareholders other than the plaintiff had presumably either assented to the defendant's acts or waived their rights in the present proceeding by failure to join therein. A distinguishing feature of this case, however, is that the corporations involved had liquidated their assets, and existed, as the court stated, "merely as legal entities." In *Johnson v. King-Richardson Co.*, (1 *Cir.*) 36 *F.* 2d 675, 67 *A. L. R.* 1465, it appeared that the sole complaining minority stockholders had specifically acquiesced in the wrongs complained of in their bill, and for this reason the bill was dismissed. *Babcock v. Farwell*, 245 *Ill.* 14, 91 *N. E.* 683, 137 *Am. St. Rep.* 284, 19 *Ann. Cas.* 74, was a similar case, it being there held that a stockholder who had expressly waived his right to object to acts done by the directors constituting a wrong to the corporation could not sue therefor on behalf of the corporation. In *Brown v. DeYoung*, 167 *Ill.* 549, 47 *N. E.* 863, it was held, in a bill filed by minority stockholders to compel an officer of a corporation to restore to the corporation moneys im-

properly received from the corporation in excess of the salary to which he was entitled, that equity would treat the misappropriation as a fund out of which a dividend should be declared, and would give to the innocent shareholders the aliquot part of the recovery. This case is directly in support of the appellants' contention. But in *Chicago Macaroni Mfg. Co. v. Boggiano,* 202 *Ill.* 312, 67 *N. E.* 17, it was held, upon a bill by a stockholder on behalf of a corporation to compel the president to account to the corporation for money wrongfully taken as compensation, that a decree compelling the president to pay over the fund to the complaining stockholder in the proportion of the stock held by him was unauthorized; and, in *Voorhees v. Mason, et al.,* 245 *Ill.* 256, 91 *N. E.* 1056, where a bill was filed by a complaining stockholder on behalf of the corporation to compel directors to account to the corporation for assets wrongfully appropriated to their use, it was held that the rule announced in the case of *Chicago Macaroni Mfg. Co. v. Boggiano, supra,* should be followed, and not the rule announced in *Brown v. DeYoung, supra.* In *Eaton, et al., v. Robinson, et al.,* 19 *R. I.* 146, 31 *A.* 1058, 32 *A.* 339, 29 *L. R. A.* 100, the bill was filed by minority stockholders against the majority stockholders and the corporation for an accounting for grossly excessive salaries taken by the defendants. The decree submitted by the complainants proposed payment directly to the complainants of their aliquot share of the amount found to be due to the corporation. The defendants contended that the decree should direct payment of the amount into the treasury of the company. The court, in a short *per curiam* opinion, citing only *Fougeray v. Cord,* 50 *N. J. Eq.* 185, 24 *A.* 499, held that the prayer of the bill was broad enough to entitle the complainants to a decree for the payment to them of their share of the moneys wrongfully appropriated as salaries, observing that the relief prayed was of better form than to require payment into the treasury of the company, and thereby, perhaps, make it necessary for the complainants to resort to another

bill to compel the payment of a dividend. In commenting on this case the court below said, "First its prayers were such as to warrant the view that the bill could be treated as one for the declaration of a dividend to the complainant, and so far as the report shows the evidence may have justified a decree of that nature, a circumstance which it cannot be said the evidence here justifies * * *." Nothing need be added to this comment; but the court below continued to say that the Rhode Island court relied entirely on *Fougeray v. Cord, supra,* unaware apparently that that case had been reversed; and in a direct comment upon the cited case it was said that *Fougeray v. Cord* had been reversed upon the very point for which it was cited by the appellants. *Laurel Springs Land Co. v. Fougeray,* 50 *N. J. Eq.* 756, 26 *A.* 886.

In *Fougeray v. Cord, supra,* the complainant, by his bill, sought to recover a share of the profits arising from the sale of land, and to set aside certain conveyances on the ground of fraud. The complainant and two of the defendants formed a corporation under the name, "Laurel Springs Land Company," to engage in the purchase, sale and improvement of land, having a capital stock of thirty shares of a par value of $50.00. The stock was equally divided between the three. Land was bought, and laid out into lots. A number of lots were sold, others were contracted to be sold, and the company made a great deal of money, having, at the time of the suit, an estimated surplus of over $36,000.00. The defendants, owning a majority of the stock, used their control to oust the complainant from the board of directors, to suppress information concerning the business of the corporation, to withhold dividends, to vote excessive salaries to themselves, and to convey assets to a corporation of their own. The Vice-Chancellor found that the defendants had been guilty of "gross and bungling thievery," and held that the resolution of the board awarding salaries and commissions, and the deeds of conveyance

by which the defendants sought to defraud the complainant be set aside; that an account be stated by which the defendants credit themselves either with salaries, or commissions, but not with both; that a receiver be appointed to take possession of all corporate property; and that there should be ascertained and paid to the complainant one-third of all the net assets, including contracts of sale, and a conveyance in fee simple in severalty of one-third of the unsold lots. Upon appeal the Court of Errors and Appeals, in *Laurel Springs Land Co., et al., v. Fougeray*, 50 *N. J. Eq.* 756, 26 *A.* 886, affirmed the decree setting aside the resolution, and putting the directors to their election between a salary or commissions; in setting aside the fraudulent conveyances; and confirming the right of the complainant to have access to the books of the company; but held that the appointment of a receiver and the awarding to the complainant of one-third of the assets of the company went too far; and that the prayer of the complainant should be met by a decree requiring the defendants as directors to declare a dividend of all the net earnings not needed for the legitimate purposes of the company's business. The appellants assert that the Chancellor erred in stating that the case was reversed on the point for which they contend. They contend that an examination of the appellate court's opinion discloses that the court expressly sustained the action of the Vice-Chancellor in permitting relief directly to the minority stockholder, and limiting the recovery to his proportionate share. But, the setting aside of the fraudulent conveyances of the real estate resulted in restoring that property to the company, and that part of the decree of the Vice-Chancellor awarding one-third of the unsold lots to the complainant was expressly disapproved. The approval of that part of the decree requiring the defendants to elect between salaries or commissions, could mean only that the defendants were required to account for either the salaries or the commissions dependent on which they should elect to retain. Presumably

the amount not retained under their election went to the company as a corporate asset from which dividends were to be paid. There is no intimation in the opinion, as we read it, that the wrongdoers could retain in their own hands as individuals the salaries, or the commissions, as the case might be, leaving them only the liability to pay to the complainant the one-third part thereof. The reversal of that part of the decree of the Vice-Chancellor awarding to the complainant the one-third part of the net assets of the company, deprives the case of its force as an authority for the appellants' position, and justifies the Chancellor's statement. To say that the injured stockholder should receive such a dividend as the financial condition of the corporation permitted, a dividend to be received as well by the wrongdoers as by the complainant, is not to say that the injured stockholder should receive only his share of the amount found to be due from the wrongdoers. Manifestly the appellate court proceeded upon the usual considerations governing the declaration of dividends. It did not regard the misappropriation as a fund from which a dividend must be declared, and the payment to the complainant of one-third part of the fund as a sufficient redress of the wrong. *Matthews v. Headley Chocolate Co.*, 130 *Md.* 523, 100 *A.* 645, arose upon an exceptional state of facts. The bill was filed by the company itself to recover from Matthews and others exorbitant salaries. The defendants, officers of the company, owned seventy-five per cent. of the company's stock. They sold to new interests a majority of the stock, presumably 351 shares at an assured price of $35,100.00. The bill was brought to recover from the former officers exorbitant salaries which they had caused to be voted to themselves. It was found that the purchasers of the stock had got exactly what they had bargained for and had not been imposed upon by Matthews. While the bill was brought by the company, the court found that it could be maintained for the benefit of minority stockholders, but that recovery should be limited "to the extent of the pro-

portions of the sum recovered due such minority stockholders, if any, as are not barred by laches, limitations or acquiescence * * * and anything recovered should be directed to be paid to them by the corporation." The court was impressed with the fact that if the former officers should be required to pay to the corporation the entire amount of the recoverable claim, the purchaser's share of the recovery would exceed by $11,000 the amount they paid for their stock. *Brown v. DeYoung, supra,* was greatly relied upon, the court either not knowing or ignoring, the fact that the Illinois Court in *Voorhees v. Mason, et al., supra,* declined to follow it. Whatever view may be taken of the case its factual situation is so different as to make it inapplicable as an authority here.

The question is whether ratification of fraudulent acts by a majority of the stockholders enures to the benefit of the defendants to the extent that the decree against them should be in such amount as to redress the wrong suffered by the dissenting stockholders by causing to be paid to them a dividend of the recoverable amount measured by their stock holdings. The answer must be in the negative. In the first place, it does not appear that the financial position of the company was such as to permit the disbursement of the recoverable amount as a dividend. The misappropriations were a fraud on Sanitary, acts which the directors could not have authorized, and which the stockholders could not ratify. To allow the defendants to retain a part of the misappropriations in proportion to the stock interest of the ratifying stockholders would be to permit ratification of illegal acts to that extent. In the circumstances it was *ultra vires* the corporation, its directors and stockholders, to make donations of corporate assets. In effect, to allow the defendants to retain a part of their unlawful gains would constitute a gift. The action here was a derivative one, brought on behalf of the corporation, and the complaint and the defenses are to be considered as

though the corporation itself were suing the defendants. If such were the action, releases to the individual defendants by one or more stockholders would be without legal effect, and in a derivative suit, such as this, releases, ratifications or waivers are equally ineffective. To permit the recovery to be diminished by an amount in proportion to the stock holdings of the ratifying stockholders would tend to encourage fraud; the effect would be to transform, by molding the decree, a derivative action into one for the benefit of the individual; and would not accord with the theory of the complaint, the prayer for relief, or the inherent nature of the wrong sought to be redressed. It would tend to weaken, if not to destroy, the efficacy of a stockholder's action to correct a corporate wrong; and would compel the complaining stockholder to accept that for which he had not sued.

It is true that the benefit of an action brought by a corporation, or a derivative action on its behalf, necessarily results to all of the shareholders equally, even when some of them have been wrongdoers, or have by acquiescence, or ratification, forfeited their equitable claims to redress; but the best method to work out the rights of the parties in a case of this kind is to preserve the fiction of corporate entity. If the misappropriation is to be regarded as a fund for a dividend in which the dissenting stockholders are to share, the result is a subterfuge, and in most cases, violative of equity. It is an old saying that one should be just before being generous, and this common sense truth is especially applicable to stockholders who, for one reason or another, are willing to condone a wrong done to their corporation and themselves. They cannot be generous with the corporation's money. They, of course, may be as generous as they please when the money has become their own.

While there may be exceptional cases, as for example, *Bailey v. Jacobs, supra,* and *Matthews v. Headley Choco-*

*late Co., supra,* where remedial equity is satisfied by allowing a recovery in an amount sufficient to satisfy non-assenting stockholders measured by their stock holdings, we are of opinion that, generally, where the action is a derivative one, brought for the benefit of a going corporation, equitable principles demand that the theory of the action be recognized and that the whole recoverable amount be decreed to be paid to the corporation, notwithstanding releases, ratifications or waivers after the event. *Harris v. Pearsall,* 116 *Misc.* 366, 190 *N. Y. S.* 61; *Voorhees v. Mason, et al., supra; Beaudette v. Graham,* 267 *Mass.* 7, 165 *N. E.* 671; *Hechelman v. Geyer,* 252 *Pa.* 123, 97 *A.* 193; *Proctor v. Farrar,* (*Mo. Sup.*) 213 *S. W.* 469; *Dill v. Johnston,* 72 *Okl.* 149, 179 *P.* 608; *Baillie v. Columbia Gold Mining Co.,* 86 *Or.* 1, 166 *P.* 965, 167 *P.* 1167; *Owens v. Lynch,* 147 *Okl.* 298, 297 *P.* 223; *Avery v. Central Bank of Kansas City,* 221 *Mo.* 71, 119 *S. W.* 1106; *Landis v. Sea Isle City Hotel Co.,* 53 *N. J. Eq.* 654, 33 *A.* 964.

The decree of the court below entered on July 14, 1937, is sustained.