146 A.2d 602 (1958)
Dorothy I. HALL (sometimes known as Dorothy M. Hall), William Nelson Hall, and Sarah E. Isaacs and Earle L. Isaacs, Jr., administrators of the Estate of Earle L. Isaacs, Deceased, Plaintiffs,
v.
JOHN S. ISAACS & SONS FARMS, Inc., a corporation of the State of Delaware, John S. Isaacs & Sons, Inc., a corporation of the State of Delaware, John S. Isaacs & Sons Cold Storage, Inc., a corporation of the State of Delaware, John S. Isaacs & Sons Realty, Inc., a corporation of the State of Delaware, Harry H. Isaacs and J. Howard Isaacs, Defendants.
Court of Chancery of Delaware, New Castle.
August 29, 1958.
On Motions for Reargument December 8, 1958.
*603 Edmund N. Carpenter, II, Wilmington, for plaintiffs, Dorothy I. Hall and William Nelson Hall.
*604 John Van Brunt, Jr., Wilmington, for plaintiffs, Sarah E. Isaacs and Earle L. Isaacs, Jr., administrators of the estate of Earle L. Isaacs.
Samuel R. Russell, Wilmington, for defendants, Harry H. Isaacs and J. Howard Isaacs, and the corporate defendants.
MARVEL, Vice Chancellor.
This action was precipitated by a family dispute concerning the management and operating results of what is essentially a large agricultural project carried on for the main part on lands situate in eastern Sussex County in the vicinity of Ellendale. The project in question is carried on through the instrumentality of the four corporate defendants, stock in each of which is held in equal amounts by each of the four children of John S. Isaacs or their heirs and representatives.[1] Stock of John S. Isaacs & Sons, Inc., was originally distributed on the basis of a one sixth stock interest to each of the four children and the remaining one third to their mother, Mary C. Isaacs. The mother's interest, however, was retired in a transaction consummated on March 1, 1952, so that the division of outstanding stock in each corporation, at least for the purposes of this suit, is the same for all four corporate defendants.
In addition to operating the farms in question the Isaacs' children now in control of the corporate defendants, namely Harry H. and J. Howard, run a cold storage plant with a storage capacity of seven million tons and rent out certain non-agricultural real estate in Georgetown and other parts of the County. It is the farms, however, which serve as the foundation of an enterprise grossing income in recent years of more than one million dollars annually, such farms having been substantially acquired and consolidated by the late John S. Isaacs, who with the assistance of his children for many years operated the entire business as sole proprietor.
Commencing in 1943 and continuing until 1949, the farms and other Isaacs properties were operated by a family partnership made up of the father, his wife, Mary C. and their children J. Howard, Harry H., Earle, and Dorothy, said partnership having been formed for the alleged purpose of insuring the continuity of the business in the event of the death or incapacity of any member of the family. The partnership agreement stipulated that the children's contribution to the partnership would be their services, although Dorothy, according to her statement under oath to the Treasury Department, actually contributed $5,000 capital (given to her by her father) and her brothers paid in capital in excess of $35,000. In 1949, the defendants, Farms and Sons, were incorporated, as hereinafter related; in 1952 Cold Storage and Realty were formed, and as of now the entire project continues to be carried on through these four corporations.
As noted, the life-blood of the entire operation lies in the growing of crops, principally lima beans, grains, grasses and the like, and the raising of livestock and fowl on some 3500 acres of tillable land and 4500 acres of marshland, woodland and untillable acreage, in the vicinity of Ellendale, title to which is held by the corporate defendant, Sons. On these lands some million chickens are raised and sold annually, and 300 head of beef cattle, 150 head of sheep and 100 hogs and pigs are regularly conditioned for sale alive. A cannery with a capacity of producing 3,000 cases of foodstuff daily is operated on the property; a saw mill, sheds and storage bins are a part of the available facilities, and numerous items of farming equipment, including twenty two tractors, fourteen trucks and the requisite number of harrows, discs, combines and other equipment are in regular use during the farming *605 season. In addition, in what is generally speaking a continuous operation, some six to a dozen broiler houses are operated in the raising and marketing of some million chicks per year.
Subsidiary to these basic activities, a cold storage plant, title to which is held by the defendant, Realty, is operated in Georgetown, and other properties, principally residential, held by this same corporation in Georgetown and elsewhere in Sussex County, are leased out to the public. Other income producing assets of the enterprise consist of 1,112 shares of common stock of American Telegraph and Telephone Company, 3,183 capital shares of First National Bank of Milford, 1100 capital shares of Sussex Trust Company and 110 shares of common stock of Electric Hose and Rubber Company, registered in the name of the defendant, Farms. Thus, Farms, which as tenant of Sons runs the farming operation, is the keystone of the enterprise, Sons' income being the modest but established annual rental of $33,000 paid to it by Farms. Realty's income consists of annual rental of some $39,000 paid by Cold Storage, and the latter corporation grosses annual income of up to $120,000 from storage charges, including $30,000 received annually from Farms.
Plaintiffs, who own[2] fifty percent of the stock of the corporate defendants bring this suit against the defendant corporations and the individual defendants, the latter being the holders of the remaining fifty percent of the issued and outstanding stock of such corporations and on the present record contend they are entitled to relief as follows: (1) the appointment of liquidating receivers for such corporations either on the grounds of stockholder deadlock (§ 226, Title 8 Del. C.) or mismanagement of corporate affairs on the part of the individual defendants;[3] (2) derivative relief based on alleged breach of trust and other misconduct in office on the part of the individual defendants, the relief thus sought being a money judgment against the individual defendants along with the cancellation of certain employment contracts; and (3) a money judgment in favor of the plaintiff, Dorothy Hall, against the individual defendants on the theory that such defendants without her consent applied corporate bond moneys rightfully hers to the retirement of federal income tax indebtedness for which she was not responsible.
Under the terms of the original partnership agreement of January 1943, each partner, other than Mary C. Isaacs and Dorothy Hall, was entitled to receive twenty percent of the net profits of the entire business. Each of the latter was to receive ten percent of such profits. In January 1944, the agreement was amended to provide for an equal distribution of net profits among all the partners. This manner of distributing profits among all the partners continued at least until the summer of 1947 when the Bureau of Internal Revenue upon an examination of the income tax returns of the Isaacs family for the years 1944-46, questioned the validity of the family partnership for federal tax purposes, taking the position initially that John S. Isaacs was actually the sole proprietor of the entire business. This claim remained unresolved as late as 1949, when in April the Isaacs family dissolved the partnership and organized John S. Isaacs & Sons, Inc. and John S. Isaacs & Sons Farms, Inc. Under the terms of the partnership dissolution agreement, title to all farms, farm buildings and *606 plants was transferred to Sons, which paid for these assets by issuing one-sixth of its authorized stock to each of the four Isaacs children and one-third of its stock to Mary C. Isaacs.[4] At the same time all farm machinery, automobiles, trucks and other machinery and equipment used on the farms were transferred to Farms in return for the issuance of one-fourth of its stock to each of the three Isaacs brothers (Earle, Harry H. and J. Howard) and one-fourth thereof to Nelson Hall, husband of Dorothy Isaacs. The partnership interest of John S. Isaacs was accounted for by the transfer to him of the Georgetown cold storage plant and rental properties located there and elsewhere in Sussex County.
On July 29, 1950 John S. Isaacs died. By will he left his cash and corporate stock to his wife, devising and bequeathing the remainder of his estate in equal shares to his four children, who were named executors. The corporate securities evidently did not reach Mrs. Isaacs, having been applied by the executors to the settlement of a claim of Farms which resulted in an open account payable by Farms of some $61,000. The children as partners thereafter carried on the cold storage business until on March 1, 1952 the corporate defendants, John S. Isaacs & Sons Realty, Inc. and John S. Isaacs & Sons Cold Storage, Inc. were formed. Thereupon the children transferred the cold storage plant and other real property which they had inherited from their father to Realty and in return therefor caused the corporation to issue interest-bearing bonds to each of them, each such bond being in the amount of $34,638.52, and to distribute its stock among them in equal shares. At the same time the children transferred cash, notes, mortgages and other miscellaneous assets which they had inherited to Cold Storage in consideration for the issuance of its stock to each of them in equal shares and the delivery to each child of an interest-bearing corporate bond, each such bond being in the amount of $46,246.80.
As a result of these transactions, all of the various Isaacs interests came under the aegis of the corporate defendants, two (Sons and Realty) merely holding real property and the like and two (Farms and Cold Storage) being operating companies. Sons, the owner of substantial farm lands, a cannery, saw mill, broiler houses and the like continues to lease these assets to Farms. The farming machinery, autos and trucks and other equipment owned by Farms are used to operate a large scale farming, canning, chicken growing and cattle-raising business. The buildings and dwellings owned by Realty in Georgetown and elsewhere are rented, the cold storage plant to Cold Storage and the dwellings to the public.
In the summer of 1954 claims of the Bureau of Internal Revenue for additional income taxes allegedly due from the Isaacs partnership for the period 1943-1949 were compromised and the amount of such asserted tax liability finally settled. This liability was determined by an agreement in part disallowing Dorothy Isaacs' claim to the status of a partner (a claim which she had allowed to be actively advanced before the Internal Revenue Service on the grounds that she had been a junior executive) and adding the percentage of the partnership income received by her to the income of her father, John S. Isaacs, for the years 1943-1947 inclusive and to that of her father and her mother jointly, for the years 1948 and 1949. As a result of Dorothy's disallowance as a partner she became entitled to receive a tax refund in the amount of $42,040.60, which she agreed should be applied to her father's tax liability. Dorothy concedes the logic of such action but objects to additional tax payments made on her behalf out of her bond *607 moneys and her alleged share of the so-called open account.
During the interval between January 1955 and February 1956, three of the corporate defendants were used as vehicles for the retirement of total Isaacs' federal tax indebtedness dating from the lifetime of John S. Isaacs of some $479,502.72, and for the payment of total taxes of about $550,000.[5] The extent to which this indebtedness was retired at Dorothy's expense in a complicated transaction accomplished without the sale of any securities or fixed assets of the corporate defendants (apart from liquidation of the Landes' note held by Cold Storage in the amount of $150,000) or the creation of a taxable dividend to the Isaacs' children, forms the basis of Dorothy's personal claim for a money judgment against the individual defendants. In fact it is the alleged mishandling of moneys and not of lands on the part of the individual defendants which plaintiffs rely on as the basis for personal and derivative relief, it being firmly established on the record that for the period complained of the combined net worth of the defendant corporations has increased, that the farm machinery is in good working order and that the lands have been well farmed, being in as good or better condition now than in 1952 when Nelson Hall resigned from management; all of which has been accomplished, despite uncertain economic trends for farmers in general and chicken growers in particular.
At the conclusion of plaintiffs' case, defendants moved for dismissal under Rule 41(b), Del.C.Ann., contending that the evidence considered as to each of the corporate defendants separately, fails to disclose a right to the relief prayed for as to each such corporation and that accordingly such motion to dismiss must be granted. I am satisfied, however, in light of the history of the corporate defendants, their family stock distribution and their otherwise close identity, that for the purpose of disposing of defendants' motion the corporations must be considered as a single economic unit having the equitable status of an "incorporated partnership", Ballantine on Corporations § 183(b) pp. 423-424. Accordingly, I decline to isolate the separate acts of wrongdoing allegedly committed by the individual defendants and considering the cumulative effect of the evidence concerning their handling of the entire enterprise, Tansey v. Oil Producing Royalties, Inc., Del.Ch., 133 A. 2d 141, deny such motion.
In support of the relief sought after final hearing plaintiffs point to evidence of a number of alleged breaches of fiduciary duty on the part of the individual defendants which they contend warrant the appointment of corporate receivers on the grounds of gross mismanagement. Insofar as plaintiffs seek derivative relief against Harry and Howard they rely upon essentially the same acts of wrongdoing so that such charges will be examined for two purposes, namely to determine whether or not each such act standing alone or joined with others, constitutes such gross mismanagement as would justify either the appointment of receivers or derivative relief or both.
Turning to the most serious charge against the individual defendants, I shall first consider Dorothy Hall's failure to receive either principal or interest on bonds of Cold Storage and Realty held by her, since June 1954. Dorothy charges that without her consent Harry and Howard, as directors in control, caused these bonds to be cancelled and applied towards the liquidation of federal tax liabilities not only of the corporate defendants but of individual members of the Isaacs family and of the estate of John S. Isaacs. While the authority of the individual defendants so to act is claimed to be found not only in an original understanding among the interested parties concerning the purpose for which *608 the bonds were designed as well as a later agreement allegedly entered into by all interested parties at a stockholders' meeting of August 19, 1954 but also in equitable considerations imposing upon each of the children of John S. Isaacs an obligation to bear equally the tax liability transferred along with their inheritance from their father's estate to the corporate defendants issuing the bonds, I am satisfied that it is unnecessary for me to analyze the mathematics of the parties' contentions concerning the bond moneys or the $61,000 Farms' open account. I say this because the evidence clearly discloses a conscientious if unilateral effort on the part of the individual defendants guided by their tax advisers to devise some fair and practical means of reducing the tremendous tax liability incurred in the Isaacs business both before and after the death of John S. Isaacs. The results of such efforts, in my opinion, do not point to a capricious or dishonest business act on their part.
While it is obvious that plaintiffs were understandably reluctant to agree to, and later, on advice of counsel, opposed the application of Dorothy Hall's bond moneys to the reduction of tax liabilities arguably not hers, the brothers acted only after other schemes of solving the family's tax difficulties had been examined and abandoned by qualified advisers. Unfortunately, defendants' principal tax adviser and accountant, Sidney Glass, died before his testimony was taken although his writings and actions give considerable insight into his theories. Assuming but not deciding that the bond moneys registered in Dorothy's name were unilaterally and improperly discharged, I find that the individual defendants in applying such bond moneys to the payment of taxes acted in what they reasonably believed was the best interests of the entire enterprise. The record clearly discloses a bona fide effort on their part to accord Dorothy equal treatment with other bondholders not only as to the children's mutual obligations to pay their father's tax liability, which had been substantially increased by Dorothy's disallowance as a partner, but also as to the obligation of each partner to assume a fair share of the liability of the entire partnership for taxes attributable to the partnership's failure to report income. The argument that if Dorothy had been deemed a partner for federal tax purposes, her tax burden would have been proportionately increased as a result of such understatement over and above her share of the increased liability of her father's estate, carries sufficient conviction to negative charges of gross misconduct on the part of her brothers. She has not proved such wrongdoing on their part in the handling of corporate bond moneys as to persuade me in my discretion to appoint corporate receivers.
The basic tax problem here at issue was confounded by the bad feeling which colors this entire dispute, making any real understanding between the Halls and the Isaacs difficult if not impossible to achieve. Following Nelson Hall's resignation as a paid employee on November 1, 1952, the Isaacs brothers thereafter consistently applied the theory that returns from the family enterprise inherited from their father should be directly related to the performance of services, a line of reasoning which has caused them to minimize if not ignore the possibility of dividends, if and when earned, a point not directly at issue here.
The simple fact is that large sums of money had to be raised for taxes, and other possible tax retirement methods such as redemption of the children's stock (which would have run the risk of being deemed a taxable dividend to the children) or by a pledging of the corporate stock held by Farms (its sale would have entailed a capital gain) met with opposition of a legal, accounting or business judgment nature both before and after the actual application of bond moneys to tax claims early in 1955. Furthermore, tax payments in the amount of $159,052.71 taken out of surplus or charged to interest expenses *609 have obviously affected a possible source of dividend payments.
In her personal claim for bond moneys, Dorothy Hall seeks recovery in her own right of a money judgment against the individual defendants. Compare Field v. Layton & Layton, 16 Del.Ch. 135, 141 A. 818. In so doing, she obliquely urges this Court to act on a matter independent of the suit brought by all plaintiffs for the appointment of liquidating receivers and for derivative relief. Significantly, she does not contend that her remedy at law is inadequate. In fact, her suit at law for a determination of the liability, if any, of the individual defendants in applying her alleged share of bond and open account moneys to tax liabilities is pending. Conscious of the weakness of her position on this phase of the case, Dorothy insists, at least insofar as the bond moneys are concerned, that if it is determined that the actions of Harry and Howard concerning her bonds amount to a breach of fiduciary duty, such determination necessarily requires the appointment of liquidating receivers, and that accordingly the matter of assessing liability on the bonds would merely be incidental to such liquidation and distribution of assets to the stockholders. She concludes that equity may and should grant complete relief in the form of a money judgment against the individual defendants. Having decided, however, that a bona fide dispute concerning Dorothy's fair share of tax liability existed and that the carefully premeditated action taken by the individual defendants as to the bond moneys does not justify the appointment of receivers, I decline to take jurisdiction of Dorothy's personal monetary claims.
Appointment of receivers on the basis of mismanagement is also sought on the grounds that the individual defendants failed to supply plaintiffs with reports of operations, balance sheets and other financial information concerning the corporations despite frequent requests for such records. There is, however, no present threat to plaintiffs' right reasonably to inspect, and in fact reams of corporate financial data, produced by discovery or otherwise, are on exhibit in this case. Plaintiffs, however, broaden this charge, pointing out that the defendant directors in furnishing annual reports to the stockholders consistently omitted items of inventory and accounts receivable. They argue that there being no formal records containing such items, the only method by which they may ascertain the value of corporate assets is through an independent audit which the individual defendants refuse to permit. Plaintiffs point to such refusal as evidence of the corporate defendants' use of the corporations for their own benefit in derogation of plaintiffs' rights.
The defendant-directors explain their position on this score by pointing out that the corporations' books are carried on a cash income and cash disbursements basis for federal income tax purposes and that their annual reports merely reflect a privilege granted farmers under the Internal Revenue Law of computing taxable income without the inclusion of inventories. It also appears that no records are kept of accounts payable and the same reason is offered by defendants as justification for this system of bookkeeping, one which was instituted while Nelson Hall was office manager for the corporations. It is also obvious that an artificial condition of high inventories as well as of high accounts receivable is consistently maintained at the end of each fiscal year in order to lessen year end profits. At the hearing, moreover, Harry H. Isaacs supplied an additional reason for not disclosing corporate financial data when he testified that he was reluctant to permit an independent audit of corporate assets because of his fear "* * that would let loose some information that would expose us to the Internal Revenue * * *"
While the Delaware Corporation Law imposes no duty upon directors to furnish annual reports to shareholders, Perrott v. United States Banking Corporation, D.C. Del., 53 F.Supp. 953, corporate directors *610 must honestly disclose all material facts when they undertake to give out written statements concerning the condition or business of their corporation, § 144, Title 8 Del.C. Here there is no proof that the defendant directors have issued false or fraudulent annual reports, having in fact been advised that their accounting system and its disclosures meet Bureau of Internal Revenue requirements, and there being no proof that assets have been or are about to be dissipated, I conclude that receivers should not be appointed upon any of these grounds. Plaintiffs have an adequate remedy in mandamus to obtain all available corporate books and records for a proper purpose, State ex rel. Miller v. Loft, Inc., 4 W.W.Harr. 538, 156 A. 170.
Appointment of receivers on the grounds of mismanagement is also sought on the grounds that the defendant-directors while in control have caused large annual salaries and expense accounts to be paid without authorization by a disinterested board of directors or without proper ratification of such director action by independent stockholder vote. Compare Sterling v. Mayflower Hotel Corp. 33 Del.Ch. 293, 93 A.2d 107, 38 A.L.R.2d 425. In fact, such payments are characterized as in part gifts of corporate assets. Compare Gottlieb v. Heyden Chemical Corp., 33 Del.Ch. 82, 90 A.2d 660 and Kaufman v. Shoenberg, 33 Del.Ch. 211, 91 A.2d 786.
Pursuing this line of attack, plaintiffs point to the action of the individual defendants at the several directors' meetings following the resignation of Nelson Hall as an officer of Farms in 1952, at which Harry and Howard either alone or in conjunction with their brother, Earle, purportedly authorized increases in salaries and expense accounts payable to them as officers of the corporation. Until Nelson Hall's resignation as an executive employee, each of the four directors of Farms (Harry, Howard, Earle and Nelson) as officers of Farms received salaries of $12,000 per annum together with an expense allowance to each of $50 per week. Shortly after Nelson's resignation, at a meeting held on January 14, 1953, the three remaining officer-directors retroactively raised their annual salaries to $18,000 and fixed their annual expense accounts at $2,500. Again, following the death of their brother, Earle, by way of alleged adjustment, the defendant-directors in March 1954, increased their salaries to $27,000 per year and authorized expense accounts of $2,600 each. These latter payments were also made retroactive.
While there is evidence of formal director ratification of at least the latter increase, I am satisfied that the votes of Harry and Howard were necessary in each instance to bring about such increases, the only vacancy on the board subject to being filled being that resulting from Earle's death. While the defendant-directors concede the general principle of law that salary increases voted by directors who as officers receive them are invalid and must be returned to the corporation, Lofland v. Cahall, 13 Del.Ch. 384, 118 A. 1; Keenan v. Eshleman, 23 Del.Ch. 234, 2 A.2d 904, 120 A.L.R. 227, they argue that this principle cannot for practical considerations be applied to a closely held corporation, contending also that the cases cited by plaintiffs deal with the services of directors as directors and not as executives whose means of livelihood and full-time employment lie with the corporation, Russell v. Henry C. Patterson Co., 232 Pa. 113, 81 A. 136, 36 L.R.A.,N.S., 199.
In the case of Maclary v. Pleasant Hills, Inc., Del.Ch., 109 A.2d 830, 835, however, the problem of self dealing by directors of a closely held corporation was considered by this Court which cited with approval Lofland v. Cahall, supra. In deciding inter alia that in the absence of other justification the issuance of 100 shares of stock as payment for services rendered by certain of the defendants who were also directors participating in authorizing such action was invalid, the Court stated:
"This case points up graphically the difficulties which may arise from the use of the corporate form, particularly in small, closely-held businesses, *611 without seeing that the legal requirements of that form are followed. Failure to do so often leads, as here, to admitted inequities. While this court is spmpathetic to Robert's position (a party whose services apparently gave rise to much of the success of Pleasant Hills), it is not free to ignore the law merely because of the hard facts of a particular case."
Furthermore, the questioned salary increases in the case at bar having been authorized by boards of directors a majority of which was made up of recipients of such benefits, the mere fact that directors owning a majority of the stock voted in favor of such corporate action cannot be substituted for the quorum requirements imposed by law, Belle Isle Corporation v. MacBean, 29 Del.Ch. 261, 49 A.2d 5.
Defendants, however, urge that the questioned increases in salaries and expense accounts having been authorized in much the same manner as were the original unquestioned $12,000 corporate salaries and expense moneys paid annually to each of the four officer-directors during the period of Nelson Hall's employment, the increases here in question should not be vulnerable to Hall's attack. It appears, however, that at the time of Nelson's resignation as an employee of Farms, each stockholder of that corporation in his capacity of executive employee was paid $12,000. Expense accounts were also authorized on an equal basis. All stockholders as directors consented to these payments from corporate funds, a course of action according with the evident intent of John S. Isaacs. When Nelson resigned as a worker and the $12,000 payments were seized upon by the several boards as the basis for evaluating the services of the remaining officers in light of the increased work load, the result was an attempt to accord to what had been an equal division of cash among the equitable owners of the enterprise, the status of precise compensation for services rendered. Accordingly, in my opinion, Nelson Hall is not estopped from questioning the validity of such increases insofar as they were improperly authorized. Finally, as will be discussed later, I have no doubt but that the votes of interested stockholder-directors at the December meetings of 1956 and 1957 were ineffectual to shift from the individual defendants and from Earle, Jr., the burden resting on them as fiduciaries, of sustaining the entire reasonableness and fairness of the amounts of compensation received by them, Johnston v. Greene, Del., 121 A.2d 919 and Gottlieb v. Heyden Chemical Corp., 33 Del.Ch. 177, 91 A.2d 57.
There remain the questions of (1) the extent of liability, if any, of the individual defendants for corporate moneys received by them and (2) whether such payments warrant the appointment of liquidating receivers for the several corporate defendants. As to point (1) I do not agree with plaintiffs' contention that the individual defendants are precluded from recovering any greater amount per year than the $12,000 figure under a theory of quantum meruit. The presumption that the remuneration of an employee hired at a fixed wage continues at the same rate after his contract expires has no application here. I have already concluded that the $12,000 figure was not firmly based upon an evaluation of services rendered, and the salary recipients are not estopped from seeking to prove the reasonableness of amounts received by them from Farms since the date of Nelson Hall's resignation.
On the present record, however, the Court is unable to determine the extent of such salary liability, if any, to persons, who under varying situations of employment due to resignation and death, were receiving varying amounts for essentially the same type of full time dirt farming. Counsel having concentrated their attention on the receivership issue, the issue of precise corporate liability for salary payments on a quantum meruit basis was neglected. I shall permit the salary recipients, who must necessarily carry the burden, to elaborate this issue through, inter alia, the introduction of evidence of proper compensation *612 for others similarly situated, Raynolds v. Diamond Mills Paper Co., 69 N.J.Eq. 299, 60 A. 941, and on remand, Gottlieb v. Heyden Chemical Corp., Del.Ch., 99 A.2d 507 and/or to restate their contentions. Counsel may confer with the Court as to what further proceedings, including the adding and realignment of parties, are necessary in order to resolve such issue.
While the technical invalidity of increased salary payments to date would appear to point to what may have been in part partial treatment of the beneficial owners of the enterprise, I am not satisfied that the directors in control deliberately sought to freeze out minority shareholders. Their theory that services should be the basis for rewards in the Isaacs' family business was reasonably applied in an attempt to mete out what seemed to them fair compensation for those members of the family who worked for the enterprise, and I reject plaintiffs' charge of a studied attempt on the part of the individual defendants deliberately to deprive plaintiffs of dividends or to dissipate corporate assets. In fact, the salary recipients may yet establish that such payments to them, although unauthorized by a proper board and not validly ratified by independent stockholders are recoverable upon a theory of quantum meruit. Be this as it may, the financial data introduced to date does not disclose such an unreasonable holding back of earnings or of their diversion to wasteful salaries as to justify this Court's interfering with the corporate defendants' normal functions through the medium of a receiver or receivers.
Plaintiffs also complain that the officers in control since March 1954 have failed to give notice of directors' meetings and that such meetings, if held, lacked a quorum. The answer to this charge is that the corporate books disclose that directors' meetings of the operating companies (Farms and Cold Storage) have been regularly held and that formal minutes were kept for all corporations. Plaintiffs could have attended such meetings. Article 6 of the by-laws of each of the corporations provides:
"Regular meetings of the directors shall be held on the first Monday evening in each month at the office of the corporation in Ellendale, or elsewhere and at other times as may be fixed by resolution of the board. No notice of regular meetings shall be required."
Such a by-law provision apparently conforms with the law of Delaware. See dictum in Lippman v. Kehoe Stenograph Co., 11 Del.Ch. 190, 98 A. 943.
In summary, I conclude that the separate acts complained of, including the so-called in terrorem countersuits against Dorothy and other charges not specifically discussed in this opinion, such as the receipt by the individual defendants of various perquisites of office including a rent-free home for Harry, gasoline, use of automobiles and liberal petty cash and food allowances, taken collectively do not constitute such "gross mismanagement, positive misconduct * * *" or such a breach of trust as to cause this Court in the absence of insolvency or the threat of insolvency to interfere by receivership process with the present operation of the corporate defendants, Thoroughgood v. Georgetown Water Co., 9 Del.Ch. 84, 77 A. 720, 724; Vale v. Atlantic Coast & Inland Corp., Del.Ch., 99 A.2d 396, and Lichens Co. v. Standard Commercial Tobacco Co., 28 Del.Ch. 220, 40 A.2d 447.
Plaintiffs' dilemma is in large part attributable to the fact that the freedom of action inherent in a partnership was lost when they voluntarily entered into a complex corporate arrangement fraught with perils for a stockholder at odds with management. Unless receiverships are justified on the grounds hereinafter discussed, plaintiffs as disgruntled investors have no recourse but to sell[6] their stock for what *613 it will bring, Drob v. National Memorial Park, Inc., 28 Del.Ch. 254, 41 A.2d 589.
Plaintiffs' final contention is that inasmuch as the existence of a stockholder deadlock as of the time of the bringing of this action is conceded, application of equitable principles compels a holding that such deadlock still prevails. Defendants in reply, claim that in December 1956 the deadlock was broken by a combining of the votes of the estate of Earle Isaacs with those of Harry and Howard to elect a slate of directors consisting of Harry, Howard and Earle, Jr., for each of the corporate defendants.
In October 1956, the four corporate defendants entered into five year employment contracts with the individual defendants and with Earle, Jr. The Earle, Jr., contract provided that he was to receive a salary of $16,000 a year plus a bonus contingent upon earnings. The agreement also guaranteed certain indirect benefits similar to those received by his uncles, such additional compensation totalling an estimated $4,000 per year. Earle, Jr., was 26 years old at the time and had never earned a salary of more than $4,000 per year prior to the date of the contract. In fact, three years before the transaction in question he had been employed by the Isaacs' interests at wages of 80 to 85 cents per hour. In March 1956, he had purchased a farm from which he hoped to earn between $3,000 and $6,000 per year. On November 10, 1956, Earle, Jr., returned from California with a stock voting agreement duly executed by his mother and himself whereby they bound themselves to vote for Harry, Howard and Earle, Jr., as directors of the corporate defendants for a period of ten years. Thereupon Earle, Jr.'s, employment contract was delivered to him in exchange for the voting agreement.
The individual defendants tacitly concede that such facts are sufficient to disqualify Earle, Jr.'s vote, 5 Fletcher Cyclopedia, Corporations (Rev.Ed.) § 2066, but argue that the bargain which gave Earle, Jr., a job should not disqualify his mother's vote. They point out that her proportionate shares added to those of Harry and Howard served to break the shareholder deadlock. However, Mrs. Hunt had agreed to vote her beneficial interest for Harry, Howard and Earle, Jr., in return for an undertaking on the part of the corporate defendants on her request to purchase her individual stock with corporate assets at a price to be arrived at by a formula. In the same agreement Harry and Howard also undertook on request to loan the sum of $30,000 to the estate of Earle Isaacs. The rule which forbids the voting of purchased votes is not limited to instances where the consideration for the purchase is strictly a corporate office and its emoluments. Shareholder votes may not be purchased for any consideration personal to the stockholder, 5 Fletcher Cyclopedia, Corporations (Rev.Ed.) § 2066. Furthermore, the delivery to Harry and Howard of votes represented by Mrs. Hunt's stock was a condition precedent to the effectiveness of Earle, Jr.'s employment contract, and such votes may not be counted. It necessarily follows that Earle, Jr.'s contract thus became automatically inoperative and Harry's and Howard's were not properly approved because of their self interest. Finally, excluding Earle, Jr.'s votes at the December 1957 meeting, not even a majority of stock was voted in favor of ratification of such contracts.
Having concluded that in equity the stockholder deadlock was not fairly broken as a result of action taken at the December 1956 meeting, a fortiori Earle, Jr.'s, and his mother's purchased votes, which prior to their purchase had been voted for the Hall slate of directors, again failed to break such deadlock at the December 1957 meeting. Accordingly, in my opinion, a stockholder deadlock in an equitable sense still exists. Should receivers therefore be appointed under § 226, Title 8 Del.C.?
Under the statute the Court may but is not required to appoint a receiver in case of actual stockholder deadlock, Paulman *614 v. Kritzer Radiant Coils, Inc., Del.Ch., 143 A.2d 272, and this discretionary power should be exercised cautiously. § 224 Title 8 Del.C. sets forth the procedure for compelling an election of directors where for some reason there has been a failure to elect, while § 226 provides a further procedure in the event that an election ordered under § 224 fails to elect a board. Compare Engstrum v. Paul Engstrum Associates, Inc., Del.Ch., 124 A.2d 722.
Having declined to permit the counting of votes which had they not been purchased might well have been cast for the rival slate of directors as was done at the January 1956 stockholders' meeting, I decline to accept the reported results of the 1956 and 1957 December meetings.
I shall appoint a master to hold a new election of directors for each of the defendant corporations. Such master shall proceed to hold such elections subject to the provisions of §§ 224 and 227 of Title 8 Del.C. and Rule 81 of this Court, as well as the rulings made in this opinion, thereafter reporting to the Court which will then take appropriate action.
Let an order in conformity with this opinion be presented on notice.

On Motions for Reargument.
The motions of the plaintiffs, Sarah E. Isaacs (Hunt) and Earle L. Isaacs, Jr., and of the individual defendants for reargument were granted because they raised grave doubt as to the correctness of my ruling concerning votes cast by Earle L. Isaacs, Jr., and his mother, Sarah E. Hunt, at the 1956 and 1957 December meetings of stockholders of the corporate defendants.
The right of a stockholder to vote for what he conceives to be his own interests and the rule that stock may not be voted in violation of the rights of another person are most difficult to accommodate under the facts here of record. 5 Fletcher, Cyclopedia Corporations (Rev.Ed.) §§ 2025, 2031 and 2066; Allied Chemical & Dye Corporation v. Steel & Tube Co. of America, 14 Del.Ch. 1, 120 A. 486; Heil v. Standard Gas & Electric Co., 17 Del.Ch. 214, 151 A. 303; Macht v. Merchants Mortgage & Credit Co., 22 Del.Ch. 74, 194 A. 19; and Ringling Brothers-Barnum & Bailey Combined Shows v. Ringling, 29 Del.Ch. 610, 53 A.2d 441.
In the case at bar two stockholders in four family owned corporations shifted their intra-corporate allegiances after receiving certain personal and corporate promises from those members of the family now in control of the corporations. It was because I deemed this action to constitute a purchase and sale of votes on the record before me that I decided that in an equitable sense a stockholder deadlock had not been broken but concluded that receivers should not be appointed under the statute at least until stockholders had been given an opportunity to attend and to vote freely at new meetings to be conducted by a master. I believe that a more complete record must be made on the issue of whether a stockholder deadlock actually exists, and I adhere to my decision to appoint a master to hold new elections. The master to be appointed will be instructed to report to the Court as to the legality and conduct of such meetings.
Pending the holding of such meetings and receipt of the master's report, I shall reserve decision on the motion of the Hall plaintiffs to strike the briefs on reargument of the plaintiff, Earle L. Isaacs, Jr.
On notice, an order will be entered appointing a master to hold special meetings of stockholders of the defendant corporations on ten days notice subject to the provisions of §§ 224 and 227 of Title 8 Del.C. and Rule 81 of this Court, Del.C. Ann.
NOTES
[1] Stock in Farms was issued to Nelson Hall rather than to his wife, Dorothy. The son, Earle, died in 1953.
[2] At the opening of the trial, counsel for Sarah E. Isaacs and Earle L. Isaacs, Jr., administrators of the estate of Earle L. Isaacs, took what he termed a neutral position in the litigation because of a clash in his clients' attitude towards the suit. Earle, Jr.'s, position and that of his mother will be further discussed on the question of the effect of their votes at stockholder meetings held in December 1956 and 1957. "Plaintiffs" hereinafter refers to the Hall plaintiffs.
[3] While the relief prayed for in (1) and (2) is directed against all the defendant corporations, all salary and expense payments to corporate officials were made by Farms.
[4] Mrs. Isaacs while receiving a double share in Sons' stock, an interest which was later retired, was not granted a stock interest in the other corporate defendants.
[5] As of May 2, 1957 outside indebtedness of the corporations (a loan from a Philadelphia bank to complete tax liability payments) had been reduced to $73,000.
[6] Statutes giving "outside" stockholders the right to an appraisal under facts such as those shown here have been adopted in some states. See Paulman v. Kritzer Radiant Coils Inc., infra.