EDWARD A. KERBS and GEORGE J. HANEY,

*vs.*

CALIFORNIA EASTERN AIRWAYS, INC., a Delaware corporation.

*New Castle, September 28, 1951.*

*Arthur G. Logan,* of Logan, Marvel & Boggs, Wilmington, for plaintiffs.

*David F. Anderson,* of Berl, Potter & Anderson, Wilmington, and *Walter R. Barry* and *George F. Mason, Jr.,* of Coudert Brothers, New York City, for defendant.

SEITZ, Chancellor: This is the decision after final hearing in an action brought by two stockholders to enjoin the defendant corporation from putting into effect a stockholder-approved plan to grant stock options and from paying money under a profit sharing plan authorized by the board of directors.

Plaintiffs are stockholders of the defendant Delaware

corporation. The defendant, which was incorporated in Delaware January 14, 1946, has outstanding 1,124,000 shares of common stock with a $1 par value. It is engaged in the business of owning, operating and leasing aircraft.

A special meeting of the defendant's stockholders was called in December, 1950 for the purpose of acting upon a stock option plan. The plan, which was approved over objection, provides as follows:

"The corporation shall grant options to purchase 250,000 shares of its authorized but unissued stock to the executives of the corporation in the following allotments:

"A. Forthwith, at the price of $1. per share:
100,000 shares to Andre de Saint-Phalle
50,000 shares to S. J. Solomon
25,000 shares to Matthew Robinson
12,500 shares to David R. Grace
7,500 shares to Norbert A. McKenna
7,500 shares to Robert E. Caskey
7,000 shares to I. O. Cooper
5,000 shares to Neil B. Berboth
4,000 shares to Leone F. Kruse
2,000 shares to H. W. Garbett

"B. From time to time hereafter, when and as approved by the Board of Directors, and at such price as it shall fix:

"29,500 shares to present or new executives of the corporation.

"Each of the aforesaid options shall contain the following provisions:

"(1) That the said option may be exercised at any time within a period of five years from the date of issuance, but in no event later than six months after the termination of the employment of the executive to whom issued, for the purchase of either the full number of shares represented thereby or for any part thereof;

"(2) That the said option shall, during the lifetime of the executive to whom issued, be exercised only by such executive;

"(3) That the said option shall not be transferred by the executive to whom issued otherwise than by will; provided, however, that in the event the executive to whom such option is issued shall die prior to exercising such option and shall not dispose of the same by

will, the rights granted under such option shall pass in accordance with the applicable laws of descent and distribution."

The said Andre de Saint-Phalle, S. J. Solomon, Matthew Robinson, David R. Grace and Norbert A. McKenna are members of the defendant's board of directors. The other individuals named in the option plan are officers and employees of defendant.

As of April 1, 1950, the defendant put into effect a profit sharing plan. It provides that after depreciation, when quarterly earnings exceed $30,000 before Federal income taxes and interest to unsecured creditors, 10% of any additional quarterly earnings shall be distributed among officers, executive personnel and members of the executive committee. If profits are less than $30,000 during any quarterly period or periods, the cumulative deficiency plus any operating loss is to be carried forward to succeeding quarterly periods.

Both the stock option plan and the profit sharing plan are here attacked by plaintiffs on the following grounds:

(1) Both plans are illegal because they were adopted by a board of which beneficiaries under the plan made up the majority.

(2) The stock option plan is illegal because the granting of the options would constitute the making of a gift of corporate property.

(3) The profit sharing plan is illegal because the payments to be made thereunder bear no reasonable relationship to the value of the services to be rendered.

The history of the defendant corporation is of importance to an understanding of and a disposition of the issues here raised. The defendant acquired four aircraft and began operations in May of 1946. The aircraft were used as cargo carriers. The company lost money during 1946 and additional financing was undertaken in February of

1947. The defendant continued to lose money and was in bad financial condition by the end of 1947. Up until this time it lost over $726,000. After an unsuccessful attempt to obtain a certificate to carry air express, the defendant on May 13, 1948 petitioned the United States District Court for an order under *Chapter XI of the Bankruptcy Act,* 11 *U.S.C.A.* § 701, *et seq.,* and was allowed to continue in possession of its property.

After the inception of the bankruptcy, the defendant dismissed 85 percent of its personnel and stopped operating its aircraft and leased it instead. The aircraft were converted into passenger carriers and while defendant lost money for a time, by September of 1948, its operations became profitable. Indeed the defendant was able to make substantial payments to its creditors by the summer of 1949. In 1949 its net profits amounted to $212,435.

In early 1950 the defendant overhauled all of its planes and made improvements making them capable of undertaking overseas flights. Due to the overhauling the planes were not available for regular use during the first half of 1950 and the profits during that period were negligible. On the outbreak of the Korean War the defendant obtained contracts with the Government to use some of the planes on the Tokyo Airlift. Others were leased to operators of passenger flights. Defendant immediately commenced to make large profits. In fact all the creditors' claims were paid in full and on December 7, 1950 the defendant was discharged from the *Chapter XI* proceedings. Its net profits for 1950 came to $244,163.58.

Although only engaged as mentioned during 1949 and 1950, the defendant through its present management did obtain a training contract with the Government. This contract formed the springboard for them to obtain other similar contracts from the Air Force of a substantial value. In order to obtain these contracts the defendant had to

enlarge its credit and in order to do so it was required to increase its capital by $150,000. This it did.

Mr. Andre de Saint-Phalle, the present chairman of the board of directors and chief executive officer of the corporation, accepted the position as president of the corporation in December, 1947. The various changes made in the business and operations of the defendant came about once Mr. de Saint-Phalle became president. These changes plus the narrated circumstances resulted in substantial improvement in the defendant's financial condition.

In May, 1949 after the approval of a plan of arrangement with defendant's creditors, Mr. de Saint-Phalle induced Mr. S. J. Solomon, Mr. David R. Grace and Mr. Matthew Robinson to accept positions on the board. They were elected on August 31, 1949. Later Mr. Solomon became president. The first meeting of the new board after the stockholders' meeting of August 31, 1949 at which several of the beneficiaries under the plans here attacked were elected, was held on September 14, 1949. At that time a special committee of three was appointed to consider the salaries of the executives and submit recommendations to the board. This report was submitted to the board on December 16, 1949 by disinterested directors. The report recommended that certain fixed salaries be allowed to the officers and executives of defendant. However the report was not intended as a final report on the matter of compensation.

After some plans were adopted and rescinded, the board at its meeting of October 24, 1950 adopted a stock option plan. At the same meeting the profit sharing plan here involved was also adopted.

The stockholders were informed of the profit sharing plan but did not vote on it. However, the stock option plan was submitted to and received stockholder approval although there was substantial dissent. Some distributions were made under the profit sharing plan.

The effectuation of the stock option plan and the making of further payments under the profit sharing plan were enjoined pending the determination of their validity.

Plaintiffs first urge that both plans are invalid because they were not adopted by a majority of disinterested directors. However it is not suggested that the stockholders did not have the power to adopt such a stock option plan originally. Consequently I can see no merit to such an attack on the stock option plan since it was also approved by a majority of the stockholders. This is to be distinguished from the point as to whether or not the adoption of such a plan amounts to the making of a gift by the corporation.

Since the profit sharing plan was not ratified by the stockholders the validity of its adoption by the board must be considered. Defendant contends that the plan was validly adopted by a disinterested quorum of directors. Let us see.

Section 25 of defendant's bylaws provides in pertinent part:

"At all meetings of the board three of the directors shall be necessary and sufficient to constitute a quorum for the transaction of business and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the board of directors, except as may be otherwise specifically provided by statute or by the certificate of incorporation or by these by-laws."

It seems clear that three disinterested directors were present and voted for the adoption of the profit sharing plan at the meeting of October 24, 1950. It is not suggested that these directors were in any way subject to any legal infirmity in this connection. However, it is true that five interested directors were present and voted for the plan. Plaintiffs do not say so explicitly but I infer from their brief that they contend the action was illegal because it was not passed by a disinterested majority of the entire board present. Of course this could not have been done

under the circumstances. Defendant says that the votes of the interested directors should be ignored and the matter evaluated as though the five interested directors had not participated. When this is done, says defendant, it appears that the plan was adopted by a majority of a disinterested quorum of directors, which, defendant urges, is all the law requires.

It is clear that a majority of a disinterested quorum of directors voted for the profit sharing plan. Their action was therefore legal insofar as the present point is concerned, unless the presence and votes of the interested directors are of importance. The courts in other jurisdictions are not in apparent agreement on this point. However, I believe the presence and votes of interested directors without more (though perhaps undesirable) should not affect the validity of corporate action taken by a majority of a disinterested quorum of directors. It is ignoring the realities of life to believe that the physical presence or absence of interested directors at the meeting is of decisive importance. If the interested directors can influence the disinterested directors they will do so whether they are present or not and whether they vote or not. Also, since the votes of interested directors may not be counted for purpose of determining validity it would seem logical that those directors should not be counted for purposes of determining what constitutes a majority. I conclude that the profit sharing plan was validly adopted insofar as its corporate regularity is concerned. See 5 *Fletcher Cycl. of Corps.*, (*Perm. Ed.*) § 2129 *p.* 424. Plaintiffs rely on *Keenan v. Eshleman*, 23 *Del. Ch.* 234, 2 *A.* 2d 904, 120 *A.L.R.* 227. That case involved a situation where there was no approval by a majority of a disinterested quorum. Moreover, *Cahall v. Lofland*, 12 *Del. Ch.* 299, 114 *A.* 224, cites cases which appear to impliedly recognize the soundness of my conclusion.

Plaintiffs next attack the stock option plan on the ground that the corporation is receiving no consideration

in return for the granting of such valuable rights. Defendant corporation urges that it is receiving legally sufficient consideration because the plan is a means of obtaining and retaining valuable executives and employees.

■ The general principles of law governing the legality of stock options is not in dispute. See *Rosenthal v. Burry Biscuit Co.*, 30 *Del. Ch.* 299, 60 *A.* 2d 106. Defendant recognizes that the corporation must receive consideration if the option is to be valid. It is clear however that this consideration may take various forms and such a conclusion is implicit in the discussions found in the *Burry Bircuit* case. See also *Sandler v. Schenley Industries, ante p.* 46, 79 *A.* 2d 606. Let us look to the facts here.

The undisputed testimony shows that the defendant's president, Mr. de Saint-Phalle persuaded Mr. S. J. Solomon, an experienced man in the field, to come with defendant. Part of the necessary persuasion consisted of a promise of defendant's then president to recommend to the board that Solomon receive stock options. Substantially the same testimony was adduced as to the beneficiary Matthew Robinson. The evidence also shows that Mr. de Saint-Phalle was dissatisfied with his compensation and expressed to the board his feeling that he could not continue with the defendant under the existing compensation arrangement. His own dissatisfaction and his promises to Solomon and Robinson were known to the board when they first considered the problem of their compensation.

A fair inference from the evidence is that the plan was adopted to retain the goodwill and services of the other employees and to prevent their enticement into other businesses.

Plaintiffs argue that the participants are under no obligation to purchase any stock; that the stock subject to the option plan involves a substantial portion of the total outstanding stock; that the stock was worth more than the option price in December 1950; that the partici-

pants are under no obligation to continue working for defendant. I do not believe the "value" of the option was out of line with the option price at the time it was granted. The future prospects are important but here they depend in large measure on aggressive management. Let us assume that the other contentions of plaintiffs are true. Does it necessarily follow that the defendant is receiving no consideration for the option? I think not. Initially, we must distinguish between the question as to whether the bases for granting options could constitute good consideration and the question as to whether the total compensation of an official is legally excessive.

True, the desire of the directors to give an official an interest by way of stock ownership, unexplained, is not sufficient consideration. *Rosenthal v. Burry Biscuit Co., supra.* But where corporate officials in the exercise of proper business judgment determine in good faith that the corporation will be benefited by the granting of stock options, then the court will not interfere if the plan is properly circumscribed with conditions which will reasonably insure that the corporation may receive the contemplated benefit. The evidence satisfies me that such a determination was here made.

Are the bases relied upon by the defendant here to support the validity of the options legally sufficient? The evidence previously mentioned shows, in substance, that the directors granted the options to some of the officials to have them continue with defendant and to others in order that they would remain with the defendant as contented officials in a field where other opportunities beckoned. Each one was shown to be contributing in some valuable way to the advancement of the corporate weal. Indeed several of those men were rendering extraordinary services. Personnel is particularly important in this type of business. It is no objection under this phase of the case that some of these officials were already receiving salaries or that they were not under contract. The point here is that the

proper corporate officials in the exercise of proper business judgment are entitled to consider the beneficial effect of this plan on the corporation's future as legal consideration for the granting of the options provided the terms of the plan are reasonably calculated to produce that result. Are they?

While the terms of the plan are quite liberal to its beneficiaries, nevertheless I believe it is sufficiently circumscribed to meet the requirement I have mentioned. The option is only exercisable during the employment of the beneficiary or within six months thereafter. The provision in case of death seems not unreasonable. On the whole the provisions have a tendency to keep the employees with the corporation and give them an incentive to improve its financial condition with possible resultant increase in the value of the stock and, of course, their options.

I conclude therefore that the stock option plan, viewed alone, is not invalid for lack of consideration.

The plaintiffs attack the profit sharing plan on the ground that payments thereunder bear no reasonable relation to the value of the services to be rendered.

How this plan operates in fact and how it may be expected to operate based on reasonable calculations of future corporate income can best be demonstrated by the following chart which shows all the beneficiaries under the plan:

| Projected Remuneration at | | | Actual or Projected | 1950 Actual |
|---|---|---|---|---|
| $5,000,000 | 7,500,000 | 10,000,000 | Revenues | $2,383,110 |
| 36,960 | 40,800 | 44,640 | A. de Saint Phalle | 33,243 |
| 19,680 | 21,600 | 23,520 | S. J. Solomon | 17,821 |
| 13,800 | 14,700 | 15,600 | R. E. Caskey | 11,543 |
| 12,360 | 13,200 | 14,040 | I. O. Cooper | 10,713 |
| 12,360 | 13,200 | 14,040 | A. J. Hunt | 476 |
| 10,200 | 10,800 | 11,400 | Neil B. Berboth | 3,466 |
| 8,040 | 8,550 | 9,060 | Leone F. Kruse | 6,542 |

| | | | | |
|---|---|---|---|---|
| 5,760 | 6,000 | 6,240 | Harold W. Garbett | 5,445 |
| 12,240 | 12,750 | 13,260 | Fred W. Caton | 2,142 |
| 7,240 | 8,400 | 9,360 | Matthew Robinson | 6,510 |
| 1,920 | 2,400 | 2,880 | David R. Grace | 1,455 |
| 1,440 | 1,800 | 2,160 | Norbert A. McKenna | 969 |

■ The amounts set forth for each individual include their salaries as well as their benefits under the plan. By way of illustration it may be noted that Mr. de Saint-Phalle receives an annual salary of $21,600 and Mr. Solomon receives an annual salary of $12,000. Viewed against this background, and the same applies to the other individuals, this court cannot conclude on the basis of the record here made that the amounts paid or which it may reasonably be anticipated will be paid under this plan bear no reasonable relation to the value of the services rendered. This is not to say that the plan might not become vulnerable at some future date under circumstances not here present. The pretax base feature heightens this possibility.

I conclude therefore that the stock option and the profit sharing plans should not be enjoined.

This case has not been presented on the theory that the aggregate of all types of compensation received by any individual is excessive within the general principle announced in *Rogers v. Hill*, 289 *U.S.* 582, 53 *S. Ct.* 731, 77 *L. Ed.* 1385. However, the court cannot but note with concern the growing tendency to assume that a corporation cannot obtain or keep qualified officials unless such persons are given large "incentives" over and above substantial salaries. These "incentives" are often given without sufficient regard for general stockholder interest.

Order on notice.