185 A.2d 765 (1961)
Hyman SAMINSKY and Betty Siegel, Trustee for Joan Siegel, Plaintiffs,
v.
Charles C. ABBOTT, Wilfred Godfrey, J. Lee Potter, Ora C. Roehl, Erwin H. Schell, Sidney L. Sholley, Cameron S. Thompson, Keystone Custodian Funds, Inc., Keystone Custodian Funds, Inc., as Trustee and The Keystone Company of Boston, Defendants.
Court of Chancery of Delaware, New Castle.
September 18, 1961.
*767 William E. Taylor, Jr., Wilmington, Abraham L. Pomerantz and William E. Haudek, of Pomerantz, Levy & Haudek, New York City, and Irving Bizar, of Rosenfeld & Silverman, New York City, for plaintiffs.
James M. Tunnell, Jr., William S. Megonigal, Jr., and Harvey S. Kronfeld, of Morris, Nichols, Arsht & Tunnell, Wilmington, and Frank B. Wallis, of Goodwin, Procter & Hoar, Boston, Mass., for defendants.
SEITZ, Chancellor.
Plaintiffs brought this action in the latter part of 1960. They are suing representatively as investors in six common-law trust funds known, together with four others, as the Keystone Custodian Funds. (Reference herein to "Funds" will embrace only the six trusts here involved.) Neither of the plaintiffs was a stockholder prior to November 1957. The Funds are registered under the Investment Company Act of 1940 (15 U.S.C.A. § 80a-1 et seq.) as diversified open-end management investment companies.
Plaintiffs are seeking to recover from Keystone Custodian Funds, Inc. ("Keystone"), a Delaware corporation, trustee for each of the funds, profits which were allegedly withdrawn from the Funds through excessive management fees and expense charges. The individual defendants are directors of Keystone. They are charged with having caused Keystone to perform the allegedly wrongful acts. Neither side attempts to differentiate the standard of liability applicable to each of the various defendants, and I find it unnecessary to do so at this stage. Plaintiffs also demand that a contract constituting The Keystone Company of Boston ("Keystone-Boston"), a Delaware corporation and defendant in this action, principal underwriter of Funds' shares be declared null and void and that Keystone-Boston, Keystone, and the individual defendants be required to restore to the Funds the "loading" charge levied upon each sale of shares. Defendants oppose these demands with a motion for summary judgment. This is the decision thereon.
Keystone was organized in corporate form in 1935. It then executed ten separate but uniform "trust agreements" offering to act as trustee for those who would purchase participating certificates in any one of the group of trusts. Each trust has a separate and distinct portfolio. The agreements set forth the amounts which the trustee is entitled to receive from the Funds under the headings of "recurring charge" and "management fee".[1] By the *768 act of purchasing his shares, each investor accepted and agreed "to be bound by the provisions of such trust agreement and all amendments thereto as fully as though the subscriber thereof." Funds thus assumed the form of a trust with a managing group independent of the control of the investors. Keystone undertook the duties of investment adviser itself, thereby obviating the need for a management contract. The loading charge was also set forth in detail in the agreement together with Keystone's powers in administering the proceeds.[2] The effect of these provisions was to establish at the outset Keystone's relation to the investors in the Funds and thereafter to repose all powers of management in its hands. Subsequently, Keystone-Boston was organized as a wholly-owned subsidiary of Keystone and pursuant to an agreement with the latter became the principal underwriter of the Funds.
I first turn to plaintiffs' claims concerning expense charges and management fees. Both sides have conceded that the provisions of the Investment Company Act do not apply to these issues and are relying on general equitable principles.
Plaintiffs contend that the language of the prospectuses and of Article I of the various trust agreements constituted representations or warranties by Keystone that the recurring charges bore a direct, or at least a reasonable, relation to the operating expenses. As I analyze their contentions, plaintiffs are arguing primarily that Keystone had an affirmative duty to disclose its actual expenses to prospective purchasers and its failure to do so constituted a breach of its duty as trustee. At this point I pass over certain problems (e. g., whether this claim could be the subject matter of a class action).
Let us consider the relationship between Keystone and prospective purchasers of its shares. Did Keystone owe them any duty such as that which is admittedly owed by a trustee to the beneficiaries of his trust? I think not, because prior to a purchase Keystone was at arm's length with prospective buyers. Keystone assumed the role of trustee only when the sale was completed. It is true, of course, that Keystone alone knew what its actual expenses were, but it had no legal duty to give such information to prospective purchasers. They were free to turn away if they were not told all they wished to know. Plaintiffs and their class were under no "disability". Consequently, the trust and fiduciary principles applicable where such relationships exist in fact are not in point here.
Since plaintiffs disclaim any intent to rely on fraud, the only remaining issue *769 under this head of the case is whether prospective purchasers could fairly construe the recurring-charge provision as a representation by Keystone that ¼ of one per cent was directly or reasonably related to Funds' actual operating expenses. The answer must be that neither the language of the trust agreements nor of the prospectuses can fairly be so construed. Thus, the prospectus says that a management fee of one-half of one per cent is charged. It adds that "a recurring charge is also made" at the rate of one-quarter of one per cent. It then states that "These charges make possible the continued operation and supervision of the Fund and compensate the Trustee for the performance of its duties and functions under the Trust Agreement." This language cannot be said to constitute a representation concerning a relationship between the amount of the recurring charge and operating expenses. The language is not even directly related to operating expenses.
Turning next to the language of the trust agreement, does the language that the recurring charge was made "in lieu of all expenses" constitute a representation of the type charged by plaintiffs? This is a somewhat closer issue but, once again I do not believe that it is such a representation. I say this because the charge is calculated in such a way that one cannot reasonably expect that the amount received will have an exact or even a reasonable relation to the amount of operating expenses at any particular time or, indeed, for any period of time. In the final analysis, the instruments merely are silent as to the issue raised by plaintiffs.
Plaintiffs are understandably concerned with explaining why a "recurring charge" provision of this type was inserted at all if Keystone was to receive only enough money to cover its operating expenses. They say the provision constituted a contractual ceiling on expenses. The provision does of course create a ceiling, but next say that if Keystone is paid more than its expenses, it is in effect obtaining additional compensation even though its compensation is purportedly fixed by the management-fee provision. Clearly any excess over expenses would, after due allowance for contingencies, constitute additional compensation. Nevertheless, the language of the formula employed in fixing the recurring charge clearly communicates this possibility to prospective purchasers. Thus, there was no legal misrepresentation. Whether there should be more disclosure under these circumstances is a matter for some other forum.
I therefore conclude that the class which plaintiffs represent has no cause of action based upon the representations made to them as prospective purchasers by Keystone.
I next consider plaintiffs' contention that Keystone should account to the Funds for so much of its compensation as has allegedly become excessive. Defendants argue at length that plaintiffs are precluded from maintaining this action by the doctrine of estoppel by contract, urging that the agreement here be treated in the same manner as any other trust indenture which fixes a trustee's compensation.
Before considering defendants' main argument, let me discuss other points made by them. They say that there are as many trusts as there are shareholders of any particular Fund and that no trust arises as to a particular shareholder until his money is deposited with Keystone, citing 2 Bogert, Trusts and Trustees (1953 ed.) § 249. Certain consequences would necessarily follow with regard to an investor's right to sue representatively and his ability to contract in his own behalf. Defendants urge, from this premise, that the reasonableness of the management fee should be tested pro rata against each individual investor. Measured in this manner the charges for each "trust" will appear very small. Passing over the fact that defendants contend elsewhere that the issue of reasonableness is not involved, is their "fragmentation" approach sound for present purposes?
*770 Each fund is created by a single trust agreement to which Keystone and all its shareholders are parties. It can be amended or otherwise changed only by a majority vote of the shareholders. Each share participates equally in all the assets. Each fund is described as a common-law "trust". The effect of these and other provisions, whether viewed singly or cumulatively, is to make it clear that each fund is but one trust. At least I so conclude for the purpose of deciding whether the aggregate compensation is properly a matter for judicial inquiry. The section in Bogert relied upon by defendants states that for purposes of the rule against perpetuities, each investor in such a trust is the "settlor and beneficiary of his own trust." Whatever its scope, I am satisfied that the quoted language does not apply to the situation here presented. I say this not only because the language of the trust agreements here would not support such a construction, but also because a legal artificiality would be fashioned that would be inconsistent with the substance of the transaction.
The heart of defendants' argument is that plaintiffs freely contracted with Keystone and are bound by their agreement. Every investor in Funds was made aware of the fact that Keystone would demand one-half of one per cent of the average net assets for its management services. Daily information could be obtained which set forth the extent of these assets. Semi-annual reports gave an account of the amounts being deducted both as recurring charge and management fee. There is no suggestion that the section granting the fee was unlawful at its inception. Defendants rely in particular on certain fundamental characteristics of an open-end management investment company. Every investor in a fund is guaranteed the right on any given day to have his proportional interest in the net assets computed and his certificates redeemed. Moreover, the very purpose of such a company is to expand and diversify in order to protect shareholders' investments. Defendants say that investors were thereby put on notice that the amount earned by Keystone would increase so long as management successfully carried out its duties. If plaintiffs became dissatisfied with the growth of the company or the terms of the agreement, they were free to withdraw. Defendants therefore contend that the amounts received under the management fee can never be deemed unreasonable or excessive so long as Keystone performs the agreed services. Thus, they say the question of reasonableness cannot be a material issue in determining the legality of the fees.
What effect should be given to the terms of the trust agreement fixing Keystone's compensation? Plaintiffs insist that insertion of the stipulated provision for compensation does not prevent recovery for the affected Funds of that compensation which is "so large as in substance and effect to amount to spoliation or waste" and "is in reality a gift in part," quoting Rogers v. Hill, 289 U.S. 582, 53 S.Ct. 731, 735, 77 L. Ed. 1385. Defendants argue that the Rogers v. Hill doctrine is fundamentally inapplicable to "a common-law business trust."[3]
I note preliminarily that defendants do not contend that the rule of Rogers v. Hill is not the law of Delaware with respect to ordinary business corporations. Cf. Kerbs v. California Eastern Airways, Inc., 32 Del. Ch. 219, 83 A.2d 473; Frankel v. Donovan, 35 Del.Ch. 433, 120 A.2d 311, 316; Forman v. Chesler, Del.Ch., 167 A.2d 442; Meiselman v. Eberstadt, Del.Ch., 170 A.2d 720.
Before analyzing defendants' contention that the Rogers case is inapplicable to business trusts, let us first consider the circumstances of Rogers v. Hill. In 1912, stockholders had by almost unanimous vote approved a by-law directing payment of a percentage of "profits" to corporate officers in addition to their fixed salaries and other sums. The plaintiffs thereafter became shareholders. The court held that the *771 percentages of net profits allotted to the officers were not per se unreasonable, nor was there any inference of actual or constructive fraud. Nevertheless the enormous growth of payments over a period of twenty years was held to warrant a review in equity. The court said:
"Much weight is to be given to the action of the stockholders, and the by-law is supported by the presumption of regularity and continuity. But the rule prescribed by it cannot, against the protest of a shareholder, be used to justify payments of sums as salaries so large as in substance and effect to amount to spoliation or waste of corporate property." Rogers v. Hill, 1933, 289 U.S. 582, 591, 53 S.Ct. 731, 735, 77 L.Ed. 1385.
Defendants do not suggest that the rule of the Rogers case, while applicable to individual executives, does not apply to a corporate recipient. They argue that plaintiffs are bound by the declarations of trust, citing State Street Trust Company v. Hall, 311 Mass. 299, 41 N.E.2d 30, 156 A.L.R. 13. This, of course, is a reiteration of defendants' emphasis on the fact that the compensation percentages appear in the various trust agreements. Does this fact remove such trusts from the ordinary rule which is illustrated by Rogers v. Hill? I think not. First of all, the State Street case itself indicates, what I believe to be the fact, namely, that a common-law business trust partakes of most of the attributes of an ordinary business corporation. While the court said the shareholders are bound by the declarations of trust, the court emphasized that there were equitable limitations on the application of the literal provisions of the trust agreement. As the Rogers case indicates, the rule concerning spoliation or waste is of equitable origin. What reason is there in logic to differentiate between the ordinary business corporation and a common-law business trust of the present magnitude insofar as the compensation issue is concerned? Viewed in their business reality, the two entities are for our purposes the same. To distinguish them here would be to recognize a difference which does not really make a difference.
Nor is there any basis for distinguishing the Rogers case merely because the compensation arrangement there was contained in a by-law, while here it is part of the trust agreement. In the Rogers case all the shareholders by purchasing their shares agreed to be bound by by-laws passed in accordance with the corporate charter. Plaintiff in that case acquired his shares after the adoption of the by-law. Thus, in law he was deemed to have had full knowledge of the existing by-law. Yet the Supreme Court held that the subsequent growth of payments to the point where they no longer bore any reasonable relation to the services rendered justified equitable intervention. Plaintiffs in the instant case are similarly situated with respect to the terms of the trust agreements. Thus, the same result would seem to be appropriate here.
Having rejected defendants' fragmentation argument, I need not decide whether the rule of Rogers v. Hill would be applicable in the case of an "ordinary" trust.
Defendants contend that plaintiffs knew when they became shareholders the dollar amount paid to Keystone as compensation. Defendants say that if the amounts were excessive at that time, plaintiffs are estopped to contest them or any such future payments. Assuming without deciding that the doctrine of estoppel would apply in this general situation, I cannot find that defendants have established the factual basis for its application. For example, defendants have not shown that plaintiffs knew or could have known the value of Keystone's services.
I express no opinion as to whether plaintiffs have standing to complain of matters occurring before they became investors.
Turning to the question of the redemption privilege, I fail to see how a disgruntled investor here is in any better position than a dissatisfied corporate shareholder. Although the investor can redeem, *772 he will suffer the loss of the amounts previously withdrawn from the Fund by the wrongdoers. He ought not be forced either to depart and submit to the loss, or remain and be deemed to have ratified. The investor may suffer adverse tax consequences in a forced withdrawal. At the very least he will incur a substantial loading charge if he invests in another Fund. Therefore I conclude for purposes of this motion that plaintiffs are not estopped from objecting to the alleged excessive compensation, nor can they be held to have continually ratified by refusing to redeem their shares.
One further point must be mentioned under this phase of the case. Plaintiffs say that even though the court finds, as it has, that the "excess" over operating expenses is not recoverable on any representation theory based on the language of the recurring charge provision, nevertheless such amounts are to be considered in determining whether the compensation received was legally excessive. I agree with plaintiffs' contention to the extent the "excess" can be considered as additional compensation.
I now turn to plaintiffs' claim that Keystone-Boston, as principal underwriter, has acted unlawfully because its written contracts with Keystone have never been approved by the investors. Plaintiffs' case is based on an alleged violation of § 15(b) (1) of the Investment Company Act which provides:
"(b) After one year from the effective date of this subchapter and sections 72 (a) and 107(f) of Title 11, it shall be unlawful for any principal underwriter for a registered open-end company to offer for sale, sell, or deliver after sale any security of which such company is the issuer, except pursuant to a written contract with such company, which contract, unless in effect prior to March 15, 1940 
"(1) shall continue in effect for a period more than two years from the date of its execution, only so long as such continuance is specifically approved at least annually by the board of directors or by vote of a majority of the outstanding voting securities of such company; and * * *"
There are in the record copies of contracts, dated June 1956, June 1958 and May 1960, between Keystone and Keystone-Boston. They are substantially identical in content except for certain provisions which I shall discuss hereafter. These contracts were admittedly not approved by Keystone's investors. Defendants say this was not required because none of them were in effect for more than two years.
The only language in the contracts dealing with the duration of the underwriting contracts is as follows:
"7. Term

"This Agreement (1) shall continue in force for such period as is permitted by the Investment Company Act of 1940, or any amendments thereto, and any rules and regulations thereunder unless sooner terminated as hereinafter provided, (2) may be extended or renewed in accordance with the Investment Company Act of 1940, or any amendments thereto and any rules and regulations thereunder, (3) may be terminated at any time by mutual consent, and (4) shall terminate automatically in the event of a change in the total initial charge as set forth in the now current General Prospectus, or in the event of the assignment of this Agreement by you."
It is interesting to note that the contracts do not contain terminal dates. Thus, those dates can only be determined through a proper construction of the Investment Company Act. As noted, defendants contend that § 15(b) (1) of the Act requires only that a contract which by terms continues for a period in excess of two years must be approved annually by the shareholders after the second year. They argue that each contract here was a completely separate one and that none of them continued for *773 more than a two-year period. Plaintiffs say that defendants' interpretation of the Act would rob it of all meaning and purpose. Under defendants' contention the underwriting contract could be renewed every other year by Keystone without approval by Funds' investors. Admittedly, by way of contrast, § 15(c) would prevent this being done in the case of a fund having a board of directors. Plaintiffs therefore argue that § 15(b) (1) must mean either that continuation of a substantially identical contract requires investor approval or that every underwriting contract must terminate at the end of two years. Defendants disagree. They say first that the contracts are not mere repetitions and secondly that, even if they were, the Act is satisfied so long as no single contract extends beyond two years.
Defendants say the wording of the Act is so clear as to compel the interpretation for which they contend. Plaintiffs contend that the language to be properly construed requires an examination of its legislative history. I believe that Section 15 can be fairly understood only in light of the circumstances surrounding its enactment.
I look then primarily to the history and background of the Investment Company Act. Section 30 of the Public Utility Holding Company of 1935, 15 U.S.C.A. § 79z-4, authorized the Securities and Exchange Commission to investigate abuses that had arisen in the investment-company field. The result of this inquiry was an extensive report to Congress outlining the organization and activities of these institutions. See, Report of the Securities and Exchange Commission on Investment Trusts and Investment Companies (1939). The Commission found that both the public interest and the interest of investors are adversely affected "when investment companies are reorganized, become inactive, or change the character of their business, or when the control or management thereof is transferred, without the consent of their security holders." 15 U.S.C.A. § 80a-1(b) (6). Before passage of the Act a vast market had developed in sales of long-term management and distribution contracts. The large sums received were attributable to the potentiality of illicit profit when investment companies were placed in the hands of unscrupulous persons. The Senate hearing on the proposed bill revealed the manner in which an underwriter could dilute the net asset value of a fund through manipulative selling practices. Hearings on S. 3580 Before A Subcommittee of the Senate Committee on Banking and Currency, 76th Cong., 3rd Sess., pt. 1, 135-145 (1940). The Act itself recognized that the interests of the investors are adversely affected when investment companies are operated in the interest of underwriters. To counter these abuses the bill granted wide new powers to fund investors whether the company was organized as a trust or a corporation. 15 U.S.C.A. § 80a-1(b) (6). Where the corporate form was employed, the members of the board of directors were classified either as "affiliated" or non-affiliated directors. Id., § 80a-2(a) (3). The purpose of these measures was presumably to isolate those groups who could best protect the fund in conflict-of-interest situations. In these critical areas of fund management Congress forbade any action by a fund or its management without the approval of one of these bodies. See, e. g., 15 U.S.C.A. § 80a-15(a), (b).
In order to discern the meaning and purpose of § 15(b) it is necessary to narrate the legislative history of this particular provision. I do this keeping in mind the type of protection that the Act was intended to provide. The precursor of the present section was numbered § 15(c) and read:
"(c) After one year from the effective date of this title, it shall be unlawful for any principal underwriter for a registered open-end management investment company or registered unit investment trust to offer for sale, sell, or deliver after sale any security of which such company is the issuer, except *774 pursuant to a written contract with such company which 
"(1) by its terms expires not later than one year from the date of its execution and is renewable thereafter only by the specific approval annually of the board of directors or of the security holders of such registered company; (Senate Hearing, pt. 1 at 11.)"
The original bill had no provision like § 15(e) which provides that investors in common-law trust funds, while ordinarily without voting power with regard to management and underwriting contracts, will have such power for the purposes of § 15. On the other hand, the original bill in § 16 gave these investors the right to elect new trustees annually. I note these provisions because they indicate the subtle shift in attitude which the Subcommittee underwent before recommending the bill in its present form. Originally investment companies organized as trusts were to be treated in the same manner as those organized as corporations. Trustees would be elected in the same way as corporate directors. Moreover the power of "directors" would be limited by the fact that management and underwriting contracts "expired" after a certain period and thereafter had to be "renewed". Renewal required approval either by a non-affiliated board or by the security holders. The proposed bill did draw one significant distinction between management and underwriting contracts. The former required approval of the shareholders before going into effect, Senate Hearing, pt. 1 at 11 (§ 15b of proposed bill); the latter did not. The drafters reasoned that investors would continually be interested in the identity of their investment adviser and in the terms of the advisory contract. This was not true of the underwriting contract, however, since an investor's only contact with the underwriter occurred when he purchased his shares.[4] The bill therefore gave management exclusive power to contract initially with the underwriter. But the duration of the contract was expressly limited to one year. The requirement of shareholder approval of any renewal would discourage the growth of various devices employed by underwriters to dilute the net asset value of a fund. Since the sales load would never accrue to the fund in any case, the terms of the contract would be of little interest to investors. The practices of the underwriter, however, affected their interests directly. For this reason shareholders were afforded the power to prevent a continuation of the fund's relationship with the underwriter.
Strong objections were raised to the proposed bill by members of investment companies organized as business trusts. They expressed the fear that election of the trustees by the investors would convert the trust into a partnership, Senate Hearing, pt. 2 at 589-593, and opposed shareholder control of contracts on the same grounds. The heart of their position was that the bill would destroy the very advantages of the trust form. Investors in a trust were guaranteed *775 continuity of management without the vagaries of proxy voting. Id. at 598. Moreover the trustees bore entire responsibility for the fund's contractual arrangements. The trust representatives were particularly alarmed at the effect the bill would have on existing long-term contracts. They felt that initial management and underwriting contracts should extend for longer periods of time before the possibility of rejection by the shareholders arose. Id. at 586-588. This would permit recovery of amounts expended in establishing underwriting or advisory service.
When the bill reached the House, both § 15 and § 16 had achieved what was to be their final form. Compare Hearings on H. R. 10065 Before A Subcommittee of the House Committee on Interstate and Foreign Commerce, 76th Cong., 3rd Sess., 18-20 (1940). Both provisions had been redrawn to meet the objections peculiar to the business trusts. Trustees of trusts existing before 1940 need not stand for election. Id. at 19. Pre-existing long-term contracts were permitted to remain in force until 1945. Ibid. The initial underwriting contract could last for two years before renewal was necessary. Id. at 18. Nevertheless, the basic determination that renewal should not occur without shareholder approval (in the case of a trust) remained firm. A new provision § 15(e), expressly granted voting rights to these investors whether or not they possessed them by virtue of the trust indenture. Mr. Schenker told the Senate Subcommittee, when the amended bill was returned from the House, that the provisions of § 15 in the new bill were "substantially the same" as those in the old. Senate Hearing, pt. 4 at 1116.
I narrate this legislative background in order to clothe the words of the Investment Company Act with their proper meaning. The original bill declared that management and underwriting contracts "expired" and had to be "renewed". The redraft uses the words "continue in effect" and "continuance". Do these words indicate a fundamental shift in policy? Defendants say that § 15(b) refers only to contracts which by terms continue for more than two years. Therefore if the contract is redrawn every second year, even though it is substantially the same, the Act is not violated. Viewing the history of this legislation and the safeguards it was intended to provide, I cannot agree with defendants' argument. Certainly, if defendants' contention is sound, one presumably efficacious purpose of the Act would vanish. From 1952, when Keystone-Boston was formed to serve as principal underwriter of Funds, the investors have never been consulted concerning the underwriting contract. This is a situation which the Act was designed to prevent.
Why then was the language of the original bill altered? Defendants are in the position of arguing that the bill was weakened in keeping with the objections raised by the trust representatives. But the legislative record does not bear out this contention. The original bill unequivocally provided for the expiration of the initial contract. None of the witnesses criticized this aspect of the bill or advocated defendants' position. At best they urged that the period before expiration be extended beyond one year, and this was granted. If anything, I believe the new wording was intended to strengthen the Act. Under the language in the original bill a contract could "expire" and then be rewritten in different form. Hence it could be argued that there was no "renewal". The Act provides however that the contract shall not "continue in effect" for more than two years. This it seems to me would make doubly certain that an underwriter could not continue as such in a different guise, but without shareholder approval.
The present wording of § 15(b) suggests another reason for reaching the same conclusion. Section 15(b) does not concern itself with an actual provision in an underwriting agreement relating to the duration of the contract. The requirements of the Act override any merely formal time limitation, though agreed upon by both the parties. When the Act intended to require *776 the inclusion of specific language in an underwriting contract, it was clear in doing so. Thus, under § 15(b) (2) the contract must provide for automatic termination in the event of assignment. Indeed the original Senate bill stated that the contract must "by its terms" expire within two years. The Act in its present form makes no such formal requirement. Instead its effect is much broader. It is directed at the continuing relationship between a fund and its principal underwriter rather than the specific provisions of the contract.
The purpose of § 15(b) is to afford the shareholders (or non-affiliated directors) an opportunity annually, after the first two years, to pass upon the continuation of that relationship. The shareholders are thereby able to maintain some control over the conduct of the principal underwriter in its sale of securities. As the hearings preliminary to the adoption of the Investment Company Act show, an underwriter could so conduct itself as to jeopardize the growth and good will of a fund. It seems reasonable to conclude that this provision constitutes a requirement with regard to the continuance of the existing relationship. It cannot be subverted by an agreement of the parties limiting the term to some particular period. Compare Brown v. Bullock, Court of Appeals, 2d Cir., 1961, 294 F.2d 415.
As noted above, the contracts in question are virtually identical in form and content. They differ only with regard to the amount of compensation allotted to Keystone-Boston for its services[5]. The percentage variations are very small and are adjusted by payments of flat fees. Under these circumstances I conclude that for the purposes of § 15 of the Act the initial contract continued in effect for more than two years. I say this because the investors were in no way affected by the changes in compensation, since the balance of the receipts from the initial commission went to Keystone. However I express no opinion at this time what the effect would be of a substantial alteration in these terms.
Congress vested shareholders with the power to guard against abusive underwriting practices, even though the size and allocation of the loading charge were beyond their immediate reach. The principal instrument for this protection is the investor's right to approve or disapprove the underwriting contract. Consequently, I declare the existing contract void under § 46 (b) of the Act because it must be considered to have been entered into more than two years ago. Whether plaintiffs have standing to raise this issue as to contracts in existence prior to their acquisition of shares, I do not now decide.
Several arguments were raised on either side which have not been dealt with at any length. Though examined, none of them proved persuasive. I will however make specific reference to two of these. Defendants assert that in compliance with S. E. C. regulations the underwriting contracts were filed with the Commission. They urge therefore that the failure of the S. E. C. to object to their conduct constitutes an administrative determination in favor of their interpretation of the Act. In the absence of any affirmative action by the Commission there is no indication that it has expressed its opinion one way or the other on this particular issue. Consequently defendants' contention is without merit. The second argument which I have referred to was raised by plaintiffs. They urged that if defendants' interpretation of § 15(b) (1) were accepted, that part of the loading charge which under the contracts accrues to Keystone should be considered compensation for the purpose of determining whether *777 Keystone has received excessive fees. Since I have adopted the interpretation of § 15 of the Act advanced by plaintiffs, it is undesirable to consider now how Keystone's part of the loading charges should be treated. I say this because I am also leaving for later decision the issue as to plaintiffs' right to a monetary recovery for violation of Section 15. The resolution of that issue may well be relevant in the treatment of Keystone's portion of the loading charge under the excessive compensation issue.
Plaintiffs have urged in their brief that the measure of monetary recovery be left for later disposition. Defendants demand in effect that plaintiffs demonstrate some proximate cause between violation of the Act and damage to the funds. I do not consider the so-called "proximate cause" issue to have been adequately briefed. The entry of an order herein will await the filing of briefs and a decision on this point. In their complaint plaintiffs raised two other claims grounded on the argument that Keystone was acting as investment advisor to the Funds in violation of the Investment Company Act. Plaintiffs have conceded that their position on this matter was legally untenable. Consequently, defendants' motion for summary judgment thereon is granted.
Present order on notice.
NOTES
[1] Article I, Sections 3, 4 and 5 read as follows:

"Section 3. A recurring charge shall be computed and deducted daily from the principal of the Fund at the rate of ¼ of 1% per annum of the Market Value of the Fund. This deduction shall be made in lieu of all expenses of operation of the Fund except the management fee provided in Section 4 of this Article and `taxes' as defined in Article IV, Section 1(F), which shall be paid by the Fund and shall be charged to the principal thereof.
"Section 4. A management fee shall be computed and deducted daily from the principal of the Fund at the rate of ½ of 1% per annum of the Market Value of the Fund.
"The management fee provided for herein shall be reduced to 3/8 of 1% per annum on that portion of the combined total Market Value of all Keystone Cusdian Funds in excess of $150,000,000. The Fund shall receive the benefit of this reduction in the same proportion that its Market Value bears to the combined total Market Value of all Keystone Custodian Funds.
"Section 5. The recurring charge and management fee provided for in Sections 3 and 4 of this Article shall be periodically received by Keystone to provide for the continued operation and management of the Fund and for remuneration to Keystone for the performance of its duties and functions under this Agreement. Keystone shall pay all operating expenses of the Fund including, but not by way of limitation, custodian, disbursing agent, audit, legal and investment advisory fees, except `taxes' as defined in Article IV, Section 1(F)."
[2] Article II, Functions and Duties of Keystone Custodian Funds, Inc., Section 1, Subsection (c) reads as follows:

"(c) To apply the initial commission, as defined in and limited by Article IV, Section 1(E), but excluding the amount receivable by the Escrow Agent in accordance with Article III, Section 7(a), to the expenses of issue and distribution, viz.: to Keystone, the underwriters and dealers for their services in connection with the issue and distribution of Certificates: * * *"
Article IV, Section 1, Subsection (E) reads as follows:
"(E) `Initial commission' shall mean the loading charge, applicable as herein set forth, for issuance, distribution and liquidation of shares of the Fund. The loading charge shall be computed by use of the percentage of the Sales Price of the Certificates which is represented by prospectus or circular to purchasers of Certificates at the time of the sale as the percentage for this purpose, provided that Keystone, if it so elects, may from time to time determine that a lesser percentage, applicable, however, only upon the purchase of Certificates with proceeds realized by the purchaser from the liquidation of Certificates in any other Keystone Funds, may be designated with respect to such sales and shall be so represented by rpospectus or circular. In such event the Custodian shall be directed to apply such proceeds accordingly. In no event shall the initial commission exceed eight and three-tenths per cent (8.3%) of the Sales Price of shares determined in accordance with this Article plus adjustment for fractions, or such lower amount as may be required from time to time by applicable law or regulation."
[3] In resolving this issue I note that no question of conflict of laws has been raised for determination.
[4] Mr. David Schenker, chief counsel for the S. E. C.'s study of investment companies, explained the safeguards of the original §§ 15(b) and 15(c) as follows:

"So we say the management contract can be for two years, if it is approved. Thereafter it is renewable yearly. We say that annually it has to be approved by the directors or the stockholders. If it is for two years, it has to be approved by the stockholders. Thereafter it can be year after year approved either by the directors or the stockholders.
"Now coming to subsection (c) [precursor of the present subsection (b)] that is an analogous provision for the person who has the distribution contract with an open-end investment trust. I think the difference in this situation is that we say it does not have to be approved by the stockholders, because in that instance the stockholder, after he buys the security, has no more interest in the distributor. The manager manages his funds. Once he has purchased the security, he should have no control over who the distributor should be. It is the function of the directors to select the person to distribute the securities and to determine what his compensation should be. (Senate Hearing, pt. 1 at 253.)
[5] Under the 1956 contract, Keystone-Boston received $15,000 per month and 90% of the initial commission.

Under the 1958 contract, Keystone-Boston received $12,500 per month and 94% of the initial commission.
Under the 1960 contract, Keystone-Boston receives 95% of the commission.
There are several other insignificant changes, but to a great degree the agreements are verbatim identical